## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ROBERT S. DORFMAN,

        Plaintiff,

   v.

MBNA AMERICA BANK, N.A.,

        Defendant.

Civil Action No. 05-10060-DPW

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS OR COMPEL ARBITRATION

Defendant MBNA America Bank, N.A. ("MBNA") hereby moves that this Court, pursuant to the Fed. R. Civ. P. 12(b)(6), dismiss the Complaint of Robert S. Dorfman ("Dorfman") for failure to state any viable claim. In the alternative, MBNA seeks to compel arbitration on any claims not otherwise subject to dismissal. In support of its Motion, MBNA states that: (1) the claims in the Complaint are subject to a valid and binding arbitration agreement contained in Dorfman's credit card agreement with MBNA (the "Agreement"); (2) pursuant to the Agreement, the National Arbitration Forum ("NAF") is the appropriate forum to address Dorfman's claims; and (3) an arbitration between the parties has already taken place and resulted in a judgment in favor of MBNA. As such, any claim for injunctive relief is also inappropriate in this matter.

## BACKGROUND AND PROCEDURAL HISTORY

Dorfman opened an MBNA credit card account on January 28, 1995. For seven years, he received and accepted credit from MBNA. On or about August 30, 2002, Dorfman made an associated bank change on his MBNA credit card account, converting his previous account to a new MBNA-Platinum Visa account (the "Account"). Pursuant

1

to Dorfman's requested conversion, MBNA issued him a new credit card with a new

account number in September 2002.  Enclosed with Dorfman's new credit card was an

August 2002 credit card agreement ("Agreement").  See, e.g., Ex. A.[1] The Agreement

governed the terms of Dorfman's Account with MBNA.  The Agreement contains a

provision stating that the Agreement, and any disputes arising thereunder, are governed

by Delaware law.  See, e.g., Ex. A.  Dorfman subsequently used the MBNA-Platinum

Visa credit card to make a number of cash advances and balance transfers.

The Agreement also includes an arbitration provision (the "Arbitration Clause").

See, e.g., Ex. A.  The Arbitration Clause provides in relevant part as follows:

> Any claim or dispute ("Claim") by either you or us against
> the other, or against the employees, agents or assigns of the
> other, arising from or relating in any way to this Agreement
> or any prior Agreement or your account (whether under a
> statute, in contract, tort or otherwise and whether for
> money damages, penalties or declaratory or equitable
> relief), including claims regarding the applicability of this
> Arbitration and Litigation section or the validity of the
> entire Agreement or any prior Agreement, shall be resolved
> by binding arbitration. . . . This arbitration agreement . . .
> shall be governed by the Federal Arbitration Act, 9 U.S.C.
> §§ 1-16 ("FAA").
>
> * * *
>
> THE RESULT OF THIS ARBITRATION AGREEMENT
> IS THAT, EXCEPT AS PROVIDED ABOVE, CLAIMS
> CANNOT BE LITIGATED IN COURT . . .

See, e.g., Ex. A.

---

[1]    The document attached at Exhibit A is an MBNA credit card account agreement dated August
2002.  Dorfman entered into his Agreement in September 2002.  Dorfman's Complaint specifically alleges
the existence of a contract with MBNA and relies upon the Agreement in asserting his claims.  Compl. at
¶¶ 20-25, 28, 29, 31.  Thus, the Agreement is integral to the Complaint and it is appropriate for this Court
to consider the entire Agreement in deciding MBNA's motion to dismiss.  See Clorox Co. v. Proctor &
Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000) ("[I]t is well established that in reviewing the
complaint, 'we may properly consider the relevant entirety of a document integral to or explicitly relied
upon in the complaint, even though not attached to the complaint, without converting the motion into one
for summary judgment'"); Orman v. Cullman, 794 A.2d 5, 15-16 (Del. Ch. 2002) (accord).

US1DOCS 4927836v1

The Agreement was not the first credit card agreement between MBNA and Dorfman that contained an arbitration clause. The agreement that governed Dorfman's prior credit card account also contained a valid and binding arbitration provision. The terms of Dorfman's earlier account with MBNA were governed by a 1994 credit card agreement (the "1994 Agreement"). See, e.g., Ex. B. The 1994 Agreement contained a provision that allowed MBNA to amend the terms of the Agreement upon notice to the cardholder and stated in substance, "We may amend this Agreement by complying with the applicable notification requirements of federal law and those laws of the State of Delaware." See, e.g., Ex. B. In 1999, MBNA and Dorfman amended the terms of the 1994 Agreement to include an arbitration provision (the "1999 Amendment"). Ex. C. The 1999 Amendment contained an arbitration provision identical in all relevant respects to the Arbitration Clause in the Agreement. Ex. C.[2]

The 1999 Amendment provided that the new arbitration provision would become effective on February 1, 2000 and would "appl[y] to all Claims now in existence or that may arise in the future" unless Dorfman rejected the Arbitration Clause in writing on or before January 25, 2000. Ex. C. Dorfman did not reject the Arbitration Clause in writing. Accordingly, the Arbitration Clause went into effect on February 1, 2000 and became part of the 1994 Agreement. In sum, Dorfman consented to not one, but two agreements to arbitrate with MBNA.

---

[2] As is discussed *supra* at note 1, Dorfman explicitly alleges the existence of a contract with MBNA. Compl. at 20-25, 28, 29, 31. As such, his past agreements with MBNA, including the 1994 Agreement and 1999 Amendments, are also relevant to the Court's present inquiry. See Clorox Co., 228 F.3d at 32.

On January 2, 2004, Dorfman wrote to MBNA complaining of a billing error on his Account in the amount of $23,772.97.[3]  See Compl. at ¶ 7; Ex. D.  In particular, Dorfman expressly alleged that he had grounds to assert a breach of the Agreement and violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*  See Ex. D.  On July 2, 2004, after attempts to resolve the billing dispute failed, MBNA commenced arbitration proceedings in the NAF,[4] in accordance with the terms of the Agreement, regarding the disputed amount.[5]  See Compl. at Ex. A.  On August 26, 2004, Dorfman filed a "Motion to Dismiss for Lack of Jurisdiction; Objection to Arbitration" with the arbitrator, alleging, *inter alia*, the lack of an agreement to arbitrate.  See Compl. at ¶ 25; Ex. E.[6]  After considering all of the evidence and information submitted by the parties to the arbitration, including Dorfman's Motion, the Arbitrator found for MBNA and issued an award in the amount of $29,495.86 on October 28, 2004.  See Compl. at Ex. B.

## ARGUMENT

Dorfman's Complaint asserts that the Arbitration Clause is unenforceable and unconstitutional.  He seeks also relief for breach of contract and pursuant to TILA for purported billing errors on his account.  All of the claims in the Complaint must be dismissed.  In a recent decision rendered by the Honorable Judge Ponsor, the United

---

[3] Mr. Dorfman's outstanding balance on his December 2003 statement was $23,772.97.

[4] The Arbitration Clause expressly provides that "[t]he arbitration shall be conducted by the [NAF], under the Code of Procedure in effect at the time the Claim is filed" and instructs the cardholder how to obtain the Code.  See, e.g., Ex A.  The Agreement, therefore, incorporates the NAF Code of Procedure by reference. See Apollo Computer, Inc. v. Berg, 886 F.2d 469, 473 (interpreting arbitral rules incorporated into arbitration agreement by reference); Cooper v. Celente, C.A. No. 90C-JL-215, 1992 WL 240419 at *7 (Del. Super. Ct. Sept. 3, 1992) (unpublished opinion) (accord).

[5] The arbitration claim sought $24,027.64, Mr. Dorfman's outstanding balance in January 2004, as well as interest and attorney's fees.

[6] Because plaintiff explicitly relies upon the January 2, 2004 letter and August 26, 2004 Motion to dismiss in his Complaint as well, the Court need not convert the present motion to a motion for summary judgment. See Compl. at ¶¶ 7, 25; Clorox Co., 228 F.3d at 32.

4

States District Court for the District of Massachusetts expressly upheld the validity and enforceability of a nearly identical arbitration clause in an MBNA credit card agreement. Any claims alleging constitutional issues pertaining to the arbitration clause, thus, are likewise without merit.

Moreover, because Dorfman agreed to arbitrate all claims arising from or relating to his MBNA Account by virtue of the Agreement, any breach of contract claims or TILA claims should have been raised in the arbitration between MBNA and Dorfman. As a result, Dorfman is precluded from relitigating those claims before this Court. To the extent that the Court finds that any of Dorfman's causes of action are not, in fact, subject to dismissal for failure to state a claim, the claims remain within the scope of his arbitration agreement and should be dismissed pending a proper adjudication before the arbitrator.

## I.    UNDER THE FAA, THE AGREEMENT AND DELAWARE LAW, MBNA PROPERLY PROCEEDED WITH ARBITRATION AGAINST DORFMAN.

Dorfman's contention that the Arbitration Clause in the Agreement is not valid and enforceable must fail. As numerous courts, including this Court, have held, the Agreement received by Dorfman in September 2002, and the Arbitration Clause contained therein, represents an enforceable contract under Delaware law. In a decision rendered on October 17, 2003, this Court, Ponsor, J., decided this very issue, ruling that "my conclusion is that the arbitration agreement contained in the [MBNA agreement] is valid…" Diamond v. MBNA America Bank, N.A., No. 03-30185-MAP, Ex. F at 40:18-20 (D. Mass. Oct. 17, 2003).[7]  Thus, the validity of Dorfman's agreement to arbitrate and

---

[7] Judge Ponsor issued his findings on the record, following a hearing. A true and accurate copy of the cited portions of the Diamond transcript is attached hereto at Exhibit F.

the strong federal policy in favor of such arbitration dictate his failure to state a claim for breach of contract arising from the Arbitration Clause in this matter.

**A.    Where, As Here, A Valid Agreement To Arbitrate Exists, Federal Law Favors Arbitration**

The FAA establishes a "strong national policy favoring arbitration" and compels the conclusion that the dispute between MBNA and Dorfman was arbitrated in accordance with the parties' written agreement.[8] Southland Corp. v. Keating, 465 U.S. 1, 10 (1984); Williams v. Healthalliance Hospitals, Inc., 158 F. Supp.2d 156, 159 (D. Mass. 2001) (strong federal policy favoring arbitration; motion to compel arbitration allowed); Meades v. Wilmington Housing Auth., No. C.A. 19743-NC, 2003 WL 939863, *4 (Del. Ch. Mar. 6, 2003) (unpublished opinion) ("Delaware has long had a policy favoring arbitration").

Section 2 of the FAA provides that:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2; Corion Corp. v. Chen, No. 91-11792-Y, 1991 WL 280288, *6 (D. Mass. Dec. 27, 1991) (arbitration clause contained in policy manual constituted an enforceable contract).

---

[8] The FAA is controlling here.  In Southland Corp. v. Keating, 465 U.S. 1 (1984), the United States Supreme Court held that the FAA is substantive federal law and preempts state laws that seek to interfere with arbitration.  See Southland Corp., 465 U.S. at 16.  Moreover, the Arbitration Clause specifically states that "[t]his arbitration provision . . . shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA")."  Ex. A.

Under the FAA, arbitration agreements are to be rigorously enforced.  See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (FAA leaves no place for exercise of discretion by district court).  Indeed, the FAA compels judicial enforcement of an arbitration agreement.  See Newspaper Guild of Salem, Local 105 of Newspaper Guild v. Ottaway Newspapers, Inc., 79 F.3d 1273, 1279 (1st Cir. 1996) (parties must proceed with arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute") (quotations and citations omitted).  Any doubt regarding the scope of arbitrable issues must be "resolved in favor or arbitration, whether the problem at hand is the construction of the contract language itself or an allegation or waiver, delay, or a like defense to arbitrability."  Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 (1983).

**B.    The Parties' Agreement to Arbitrate Is A Valid And Enforceable Contract Under Massachusetts And Delaware Law.**

The Agreement between MBNA and Dorfman provides in substance that "[t]his Agreement is made in Delaware and we extend credit to you from Delaware.  This Agreement is governed by the laws of the state of Delaware … and by any applicable federal laws."  See, e.g., Ex. A.  Massachusetts law recognizes the validity of choice-of-law provisions and the parties' ability to determine the law that governs an agreement.  Diamond, No. 03-30185-MAP, Ex. F at 38:14-39:18 (upholding choice of Delaware law in MBNA credit card agreement under choice-of-law-analysis); Morris v. Watsco, Inc., 433 N.E.2d 886, 888 (Mass. 1982) (Massachusetts law recognizes the right of the parties to a transaction to select the law governing their relationship).  Accordingly, Delaware law applies to the Agreement.

7

In fact, the Delaware choice-of-law and arbitration provisions in MBNA credit card agreements has been specifically upheld by the United States District Court for the District of Massachusetts, the Delaware Superior Court and the United States District Court for the District of Delaware.   Diamond, No. 03-30185-MAP, Ex. F at 39:15-18; Edelist v. MBNA America Bank, N.A., 790 A.2d 1249, 1256 (Del. Super. 2001); Lloyd v. MBNA America Bank, N.A., No. Civ. A. 00-109-SLR, 2001 WL 194300 at *4 (D. Del. 2001), aff'd 2002 WL 21932 (3rd Cir. Jan. 7, 2002).  In upholding the Delaware choice-of-law provision in a cardholder's MBNA agreement, Judge Ponsor ruled that:

> If I was to step back and use the choice of law provisions, this is a particularly tough situation for the plaintiff to argue that some law other than Delaware applies.  MBNA is a Delaware corporation.  It informed plaintiff that they were going to be using Delaware law at the time the contract was entered into.  … So I think even applying the traditional rules that are used to determine the choice of law, Delaware law really applies.

Diamond, No. 03-30185-MAP, Ex. F at 38:14-39:17.[9]

1. *This Court Has Previously Held That Arbitration Clauses in MBNA Credit Card Agreements are Valid and Enforceable*

With respect to agreements to arbitrate, Delaware law provides that, "[a] written agreement to submit to arbitration any controversy existing at or arising after the effective date of the agreement is valid, enforceable and irrevocable . . ."  Del. Code Ann.

---

[9] The Delaware Superior Court engaged in a very similar choice-of-law analysis when upholding the Delaware law provision in an MBNA agreement:

> MBNA is incorporated in Delaware and has its principle [sic] place of business in this state.  It deals with credit cardholders all over the United States and it would clearly desire as much uniformity as possible in the interpretation of its credit card agreements and disputes.  MBNA chose Delaware, in large part, for its laws concerning credit card accounts.  Delaware, in turn, has more than a passing interest in the validity and enforcement of choice-of-law provisions such as this one.

Edelist, 790 A.2d at 1256.

US1DOCS 4927836v1

Title 10, § 5701; see also Edelist, 790 A.2d at 1260 (arbitration agreements in adhesion contracts are enforceable). Consistent with Delaware law, this Court has already determined that a virtually identical MBNA arbitration provision is valid and enforceable. Diamond, No. 03-30185-MAP, Ex. F at 37-42 (MBNA credit card agreement amended to include arbitration clause enforceable); see also Lloyd, 2001 WL 194300 at *3-4 (accord); Edelist, 790 A.2d at 1251 (accord). Judge Ponsor, ruling from the bench on a motion to compel arbitration in Diamond, held that the MBNA arbitration clause was enforceable under Delaware law where plaintiff failed to opt out of an arbitration amendment. Diamond, No. 03-30185-MAP, Ex. F at 37:4-42:12. Like in the present case, the plaintiff in Diamond asserted a claim for breach of contract, as well as various federal statutory claims, and argued that the MBNA arbitration clause was not enforceable. Id., No. 03-30185-MAP, Ex. F at 9-11. However, this Court determined that "[u]nder these circumstances my conclusion is that the arbitration agreement contained in the 1999 amendment is valid [and] does cover this situation…" Id., No. 03-30185-MAP, Ex. F at 40:18-20.

Similarly, in Edelist, a credit cardholder brought claims against MBNA alleging breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent or negligent misrepresentation, and violation of the Delaware Consumer Fraud Act. Edelist, 790 A.2d at 1251. The court held that Delaware law applied based on the choice-of-law provision in the agreement, and found that the account holder had received sufficient notice of an arbitration amendment to establish an agreement to arbitrate. Id. at 1258 (rejecting plaintiff's argument that he did not receive notice of amended terms and compelling arbitration). In Lloyd, the United States District Court for the District of

Delaware upheld the same MBNA arbitration amendment and rejected plaintiff's challenge to the enforceability of the agreement. Lloyd, 2001 WL 194300, at *2 (claims alleging TILA violation, consumer fraud and breach of contract all arbitrable under arbitration clause in MBNA credit card agreement). In all of these cases MBNA arbitration clauses were upheld as enforceable over the objections of the cardholders that there was no valid agreement to arbitrate.

In the instant case, Dorfman likewise claims that the "original contract [with MBNA] did not contain any provision or clause to submit any dispute arising out of the agreement to arbitration," implying that MBNA attempted to amend his credit agreement to include an arbitration provision without sufficient notice. Compl. at ¶ 21. However, when Dorfman converted his Account in 2002 he received and accepted the entirely integrated Agreement, complete with the Arbitration Clause. See, e.g., Ex. A. Moreover, because Dorfman also received and accepted the 1999 Amendments to his earlier 1994 Agreement without opting out, Dorfman has in fact agreed to arbitration provisions with MBNA on two occasions. In light of the significant authority upholding the enforceability of such provisions, plaintiff cannot now claim that the Arbitration Clause is inapplicable due to a lack of notice.

> 2.  *Plaintiff's Contention That The Arbitration Clause Is Unconstitutional Is Without Merit And Is Contrary To This Court's Decision In Diamond v. MBNA.*

Plaintiff's various constitutional claims serve only to raise an additional unsuccessful challenge to the validity of the Arbitration Clause. In particular, plaintiff appears to assert that enforcing the arbitration clause violated his rights to due process, a jury trial, and "use of the courts as a means to resolve the dispute" as well as his rights

10

under the contracts clause.[10]  Compl. at ¶¶ 35-39.  In light of this Court's decision

upholding the validity of a near identical MBNA arbitration provision, as well as

Delaware precedent to the same effect, Dorfman's constitutional objections are

unfounded and must be dismissed.  See Diamond, No. 03-30185-MAP, Ex. F at 37:4-

42:12; Lloyd, 2001 WL 194300, at *2; Edelist, 790 A.2d at 1258.

Despite Dorfman's assertions to the contrary, "[t]he authority of the courts to

relinquish their decision making authority in favor of the arbitrator's to the extent

described in a private contract has long been assumed to have passed constitutional

muster."  DeCosta v. Columbia Broadcasting Sys., Inc., 520 F.2d 499, 505 (1st Cir. 1975).

Plaintiff received and accepted the Agreement and Arbitration Clause with his new credit

card in September 2002.  In particular, the agreed to Arbitration Clause specifically

provides that, "CLAIMS CANNOT BE LITIGATED IN COURT, INCLUDING SOME

CLAIMS THAT COULD HAVE BEEN TRIED BEFORE A JURY."  Ex. A (emphasis

in original).

Indeed, numerous courts have submitted the disputes of credit cardholders to

arbitration over similar baseless constitutional objections.   See, e.g., In re Currency

Conversion Fee Antitrust Litigation, 265 F. Supp. 2d 385, 414-15 (S.D.N.Y.2003)

(enforcing motion to compel arbitration over Seventh Amendment objections of plaintiff

credit cardholders); Marsh v. First USA Bank, N.A., 103 F. Supp. 2d 909, 920-21 (N.D.

Tex. 2000) (agreeing to arbitrate "necessarily waive[s]" right to judicial forum and

---

[10] Dorfman has not challenged the validity of the arbitration proceeding, but rather premises his claims upon his unfounded contention that the Arbitration Clause is invalid or somehow should not apply to him. See Compl. at ¶¶ 35-39.  Moreover, had plaintiff raised any such concerns, Rule 43, "Reopening and Reconsideration," of the NAF Code of Procedure expressly permits an arbitrator to reconsider an award upon request from a party within forty-five days from the date the award is entered.  Dorfman made no such request within the forty-five day period, which has now elapsed.

US1DOCS 4927836v1

concomitant right to jury trial). Moreover, merely pursuing a claim in arbitration, without more, does not deprive a credit cardholder of his or her due process rights to a fair, impartial and effective hearing. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 30 (1991) (rejecting generalized claims of arbitral bias and finding sufficient protections of due process in arbitral rules); Marsh, 103 F. Supp. 2d at 925 (finding credit cardholders' claims of impartiality directed at NAF "illusory").[11]

## II. DORFMAN IS BARRED FROM RELITIGATING THIS ACTION BECAUSE ALL OF HIS CLAIMS ARE ARBITRABLE AND SHOULD HAVE BEEN RAISED BEFORE THE ARBITRATOR

All of the claims Dorfman has alleged are susceptible to inclusion under the parties' written agreement to arbitrate their disputes. Because Dorfman raised or should have raised all of these claims with the arbitrator, the present action represents an improper attempt to relitigate these matters and should be barred by the doctrine of *res judicata*.

### A. Plaintiffs' Claims All Fall Within The Scope Of The Agreed To Arbitration Clause

Although the general rule is that arbitrability is to be determined by the court, the Arbitration Clause specifically encompasses the issue of arbitrability, including: "[c]laims regarding the applicability of this Arbitration and Litigation section or the validity of the entire Agreement," demonstrating that the parties agreed that issues of

---

[11] The Complaint's allegation that the arbitration clause is unenforceable because it implicates the contracts clause is equally without merit. The impairment of contracts clause provides that "[n]o *state* shall … pass any…Law impairing the Obligation of Contracts…" U.S. Const. Art. I, § 10, cl. 1 (emphasis added). Any unconstitutional impairment, therefore, necessarily involves state action. Energy Reserves Group, Inc. v. Kan. Power & Light Co., 459 U.S. 400, 411 (1983) (describing threshold inquiry under contracts clause analysis as "whether state law has, in fact, operated a substantial impairment of a contractual relationship."). However, Dorfman has pointed to no state law impairing his contractual relationship with MBNA. Rather, the instant agreement to arbitrate is governed by the federal legislative scheme set forth in the FAA, thereby preempting any state law interfering with the arbitration. See Southland Corp., 465 U.S. at 16.

arbitrability were to be determined by the arbitrator.  Ex. A; See Apollo Computer, Inc. v. Berg, 886 F.2d 469, 472-73 (1st Cir. 1989) (parties contracted to submit issues of arbitrability to the arbitrator; parties may agree to let arbitrator decide whether issues are arbitrable, including whether a valid arbitration agreement exists).  Where such clear and unmistakable evidence of the parties' intent to submit questions of arbitrability to the arbitrator exists, the Court must defer to the arbitrator's decision concerning the scope of the agreement.  First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995) (requiring courts to "give considerable leeway to the arbitrator, setting aside his or her decision only in narrow circumstances" where the parties agreed to submit questions of arbitrability to arbitration).  The existence and enforceability of the Dorfman-MBNA agreement to arbitrate, an issue raised in the NAF arbitration in Dorfman's August 26, 2004 Motion to Dismiss, were therefore properly decided by the arbitrator.

Moreover, Dorfman's claims arise from or relate to activity on his MBNA Account, MBNA's alleged conduct relating to his Account or the Agreement.  The language of the parties' Arbitration Clause itself determines what issues the parties have agreed to arbitrate.  See Moses, 460 U.S. at 24-5.  Here, the Arbitration Clause is broad, applying to "[a]ny claim or dispute . . . arising from or relating in any way to this Agreement or any prior Agreement or your account . . . including Claims regarding the applicability of this Arbitration and Litigation section or the validity of the entire Agreement . . ."  Ex. A; Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 398 (1967) (analogous language demonstrated "broad" arbitration clause).

Dorfman's TILA claim, alleging inaccuracies in his monthly statement, is, thus, within the scope of the Agreement and subject to arbitration.  See, e.g., Currency

Conversion, 265 F. Supp. 2d at 408-9 (compelling arbitration of credit cardholders' TILA claims); Lloyd, 2001 WL 194300, at *3 (MBNA arbitration clause covered TILA claim); Marsh, 103 F. Supp. 2d at 922-24 (accord); Sagal v. First USA Bank, N.A., 69 F. Supp. 2d 627, 631-32 (D. Del. 1999) (accord).

Dorfman's breach of contract claim also falls squarely within the scope of the Arbitration Clause. See, e.g., Hale v. First USA Bank, N.A., No. 00 Civ. 5406 JGK, 2001 WL 687371 at *5 (S.D.N.Y. Jun. 19, 2001) (compelling arbitration of credit cardholder's TILA and breach of contract claims under Delaware Law); Edelist, 790 A.2d at 1261 (enforcing MBNA arbitrability provision despite breach of contract claims).

To the extent that this Court has doubts concerning the scope of the arbitrable issues, the heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration. Williams, 158 F. Supp.2d at 159 ("[A]ny doubt over whether a particular dispute is covered by an arbitration agreement should be resolved in favor of arbitration.").

### B.    Dorfman Is Barred From Relitigating His Arbitrable Claims By The Doctrine Of *Res Judicata*

Because all of Dorfman's claims are otherwise arbitrable and arise out of his credit card Account or the Agreement, he had the opportunity to submit all such claims in the appropriate arbitral forum and, in fact, did raise at least some of his allegations before the arbitrator. As such, Dorfman seeks to improperly circumvent the arbitrator's final judgment and place his claims before this Court.

An arbitration award made in accordance with a valid agreement to arbitrate is a final and binding determination of the controversy. See Brennan v. King, 139 F.3d 258,

267 n.11 (1st Cir. 1998) ("Once parties have been remitted to arbitration and an award is

lawfully entered, no party may sue *de novo*.")  The preclusive effect of an arbitral award

is a question of state law.  <u>Wolf v. Gruntal & Co.</u>, 45 F.3d 524, 527 n. 3 (1st Cir. 1995)

(applying choice of law provision in agreement to arbitrate when determining preclusive

effect of prior arbitration).  Under Delaware law, the doctrine of *res judicata* bars the

relitigation of an arbitration involving the same parties and based upon the same causes

of action or causes of action that could have been argued in the earlier proceeding.  <u>See</u>

<u>Solarino v. Anthony & Sylvan Pools Corp.</u>, No. 03C09045 HDR, 2004 WL 2914290 at

*4 (Del. Super. Ct. Dec. 15, 2004) (unpublished opinion) (precluding claims based on

earlier arbitration); <u>RSS Acquisition, Inc. v. Dart Group Corp.</u>, No. 99C-05-275-WTQ,

1999 WL 1442009 at *8 (Del. Super. Ct. Dec. 30, 1999) (unpublished opinion) (accord);

<u>Cooper v. Celente</u>, C.A. No. 90C-JL-215, 1992 WL 240419 at *7 (Del. Super. Ct. Sept.

3, 1992) (unpublished opinion) (accord).  In particular, Delaware courts examine

whether:  (1) the prior adjudication had subject mater and personal jurisidiction; (2) the

parties to the prior action were the same as the parties in the pending case; (3) the prior

cause of action was the same or the issues decided in the prior action were the same as

those raised in the pending case; (4) the issues in the prior case were decided adversely to

the contentions of the plaintiff in the present case; and (5) the prior decree was final.

<u>Cooper</u>, 1992 WL 240419 at *6.   The *res judicata* effect of arbitration awards "is in

accordance with Delaware's strong public policy in favor of arbitration."  <u>Id</u>.

Here, there is no dispute that the parties to the prior arbitration were the same, the

arbitration decision was adverse to plaintiff and that the arbitration award was final and

binding.  <u>See, e.g.</u> <u>Ex. A</u> ("Any claim or dispute … shall be resolved by binding

arbitration."); NAF Code of Procedure, Rule 39(B) ("An Award becomes final when entered."); <u>Cooper</u>, 1992 WL 240419 at *5 (looking to rules of arbitral forum incorporated by reference into arbitration agreement when determining finality). By the terms of the agreement, the arbitrator had jurisdiction to decide Dorfman's present claims because they stem from his Account and the Agreement. <u>See</u> <u>RSS Acquisition</u>, 1999 WL 1442009 at *4 (finding jurisdiction where parties consented to arbitration in underlying agreement); <u>Cooper</u>, 1992 WL 240410 at *6 ("The arbitration panel had jurisdiction over the parties and the subject matter under the terms of the [arbitration] Agreement.").

Likewise, the claims presently before the Court were either previously made to the arbitrator by Dorfman or could have been made to the arbitrator. Plaintiff filed a Motion to Dismiss with the arbitrator expressly alleging that "there is no agreement between the parties" to arbitrate and announcing his intention not to participate in the arbitration. <u>See</u> <u>Ex. E</u>. Pursuant to NAF Code of Procedure, Rule 36, the arbitrator was obligated to consider the merits of his claims and could not make an award based solely on Dorfman's absence. <u>See</u> NAF Code of Procedure, Rule 36(B) and (E). Evidencing consideration of Dorfman's arguments in his decision, the arbitrator explicitly acknowledged review of Dorfman's Motion to Dismiss in the October 28, 2004 award. <u>See</u> Compl. at Ex. B.

With respect to the TILA claim, Dorfman initiated the billing dispute underlying the prior arbitration by alleging grounds to assert the very same TILA violations in his January 2, 2004 letter to MBNA. <u>See</u> <u>Ex. D</u>. The TILA claims in the letter as well as the present Complaint allege billing errors in Dorfman's account pursuant to 15 U.S.C. § 1666. Those billing errors concern the outstanding balance that was ultimately addressed

in arbitration.  As such, his present claims arise from the same nucleus of common facts

at issue in the arbitration:  the disputed outstanding balance on his Account and the

appropriate manner in which to resolve that dispute.  See Cooper, 1992 WL 240419 at *7

(barring both statutory and common law claims in subsequent litigation that arose from

common transaction addressed in arbitration).

Moreover, in light of the content of his January 2, 2004 letter, Dorfman was

certainly aware of his potential TILA claim at the time of the arbitration.  Therefore,

although Dorfman had an opportunity to raise his related TILA claim with the arbitrator,

he chose instead to forego that opportunity.   See Solarino, 2004 WL 2914290 at *4

("Even if [Plaintiffs'] arguments were not argued before the arbitrator, Plaintiffs' claims

would still be barred because the doctrine of *res judicata* also precludes issues that could

have been brought before the arbitrator."); see also NAF Code of Procedure, Rule 36(A)

("An Arbitrator may issue an Award or Order when any Party has failed to respond,

appear, or proceed at a Hearing, or otherwise defend as provided in this code."); Val-U

Constr. Co. v. Rosebud Sioux Tribe, 146 F.3d 573, 582 (8th Cir. 1998) (barring

subsequent breach of contract claim based on preclusive effect of arbitration proceeding

not attended by defendant).

## III.    ALTERNATIVELY, GIVEN THE ARBITRABLE NATURE OF DORFMAN'S CLAIMS, THE COURT MUST DISMISS HIS ACTION AND COMPEL ARBITRATION.

To the extent that the Court determines that any of Dorfman's claims remain

viable, the appropriate remedy is to compel arbitration of those claims pursuant to 9

U.S.C. § 4 and dismiss the present action pending arbitration.  9 U.S.C. § 4; Bercovitch v.

Baldwin School, Inc., 133 F.3d 141, 156 n.21 (1st Cir. 1998) ("[A] court may dismiss,

rather than stay, a case when all of the issues before the court are arbitrable."); Diamond,

17

No. 03-30185-MAP, <u>Ex. F</u> at 42 (dismissing complaint and compelling arbitration);

<u>Lloyd</u>, 2001 WL 194300 at *4 (dismissing complaint where all claims are arbitrable).

## IV.    INJUNCTIVE RELIEF IS NOT WARRANTED AS DORFMAN CANNOT SHOW IRREPARABLE HARM NOR LIKELIHOOD OF SUCCESS ON THE MERITS

In Count IV of his Complaint, Dorfman seeks immediate injunctive relief from the October 28, 2004 arbitration award in this matter.  As such, plaintiff is not entitled to a preliminary injunction unless he can meet the heightened standard for preliminary injunctive relief and show that:  (1) plaintiff will suffer irreparable injury if the injunction is not granted; (2) such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) plaintiff has exhibited a likelihood of success on the merits; and (4) the public interest will not be adversely affected by the granting of the injunction. <u>Bercovitch</u>, 133 F.3d at 151 (overturning preliminary injunction granted pending arbitration where plaintiff not likely to succeed on the merits).  Under the instant facts, Dorfman cannot meet the required showing.

A demonstration of irreparable harm is a "necessary threshold" for an award of injunctive relief.  <u>Charlesbank Equity Fund II, L.P. v. Blinds to Go, Inc.</u>, 370 F.3d 151, 162 (1st Cir. 2004).  Dorfman has failed to make the necessary showing because he has an adequate remedy at law for any purported harms – money damages.  <u>CMM Cable Rep., Inc. v. Ocean Coast Props.</u>, 48 F.3d 618, 622 (1st Cir. 1995) ("[A]n entitlement to money damages, without more, rarely constitutes an adequate basis for injunctive relief.")  Any legally cognizable harm that could foreseeably result from enforcement of MBNA's award would be fully compensable by money damages.  <u>See Charlesbank</u>, 370 F.3d at 162. ("Irreparable harm most often exists where a party has no adequate remedy at law.")

18

In fact, plaintiff, in his Complaint, seeks to be made whole solely through the award of money damages.

Dorfman has similarly failed to show a likelihood of success on his claims. As is demonstrated above, an arbitration has already taken place between MBNA and Dorfman relating to his Account and an award has already entered in favor of MBNA. Dorfman is thus barred from asserting his claims before this Court in light of the preclusive effect the earlier arbitration award in MBNA's favor. His challenge to the Arbitration Clause also fails to demonstrate a likelihood of success. This Court and numerous others have found that MBNA credit card agreements adopting the very same or similar arbitration clauses constitute enforceable agreements under Delaware law. Constitutional objections to the enforceability of arbitration agreements, such as Dorfman's, have likewise been held to fail. Moreover, given the arbitrability of Dorfman's claims, any decision permitting a preliminary injunction, would be contrary to the public interest in fostering arbitration.

## CONCLUSION

Based on the foregoing discussion, MBNA respectfully requests the entry of an order dismissing the Complaint in its entirety.

MBNA AMERICA BANK, N.A.

By its attorneys,


_/s/ Christopher B. Zimmerman___
Stephen A. Jonas/BBO#542005
Christopher B. Zimmerman/BBO#653854
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000


Dated:  January 19, 2005

19

US1DOCS 4927836v1

CERTIFICATE OF SERVICE

I, Christopher B. Zimmerman, hereby certify that on this 19th day of January,

2005, I served a true and accurate copy of the foregoing document by Federal Express to:

Roberts S. Dorfman, 48 Cherry Tree Road, Cotuit, MA 02635.

                                             __/s/ Christopher B. Zimmerman__
                                              Christopher B. Zimmerman

US1DOCS 4927836v1

# Exhibit A

**CREDIT PROTECTION PLAN with Bonus Credit Report**

☑ **YES!** Enroll me in OPTIONAL Credit Protection. I have read the disclosures on the reverse. I understand the cost is $0.85 cents per $100 of my Plan balance and that I can cancel at any time. Purchase is not a condition of obtaining credit. I authorize the Credit Protection fee to be billed to my account monthly.

X _____
Initial Here

**I also wish to enroll my other MBNA account, ending in** __ __ __ __ (last 4 digits)

92R5C70X68U2091R

Name and Address

ROBERT S DORFMAN
48 CHERRY TREE RD
COTUIT MA
02635-330748

0007623

N

# Important Offer . . .

Enroll your account(s) and you're eligible to receive a bonus credit report and quarterly activity updates.

## Credit Protection is not automatic!

To enroll and receive your bonus credit report and monitoring service activity, please initial and return the response form or call 1-877-884-5580.

**ENROLL TODAY!**

**Reward Yourself With Air Travel, Hotel Stays, Brand-Name Merchandise, and More!** It's simple; you'll earn one point for every dollar in purchases charged to your credit card. Redeem your points online at www.mbnaplusrewards.com. Start earning your points today!

| ACCOUNT NUMBER: **4264 2951 5107 4332** | CREDIT LINE: **$25,400** | NUMBER OF CARDS: **1** |

- To order additional or replacement cards, call us toll free at 1-800-421-2110.
- Please sign the back of your card now. Your card must be signed to be valid.
- Destroy any old cards relating to this account number.
- Verify your name and address. Notify us if corrections are required.

- Information regarding your account benefits will be mailed separately.
- See the enclosed credit card agreement for more information.
- You may use your available credit for both cash advances and purchases.

## REQUIRED FEDERAL DISCLOSURE

**Definitions:** Cash Advance is (1) a transaction drawing upon your account at an automated teller machine ("ATM Cash Advance"); (2) a transaction at any financial institution drawing upon your account, including overdraft protection transactions if this account is eligible for and properly enrolled in such a program, or the reposting of any payment that has been returned unpaid and any related finance charges ("Bank Cash Advance"); (3) an electronic or other transfer of funds drawing upon your account that is not otherwise an ATM Cash Advance or a Bank Cash Advance ("Balance Transfer"); (4) use of a check provided by us (i.e., in which you sign the check as the drawer) drawing upon your account ("Check Cash Advance"); and (5) any other method of obtaining a cash loan, and all fees associated with any Cash Advances ("Other Cash Advance").

A "Purchase" is (1) a transaction using your card to purchase or lease goods or services from one who honors the card; (2) a transaction and the fees associated with using your card to purchase "Cash Equivalents" (i.e., wire transfers, person-to-person money transfers, money orders, bets, lottery tickets, and casino gaming chips) anywhere other than a bank; (3) Account Fees; and (4) any other transaction that is not otherwise a Cash Advance.

"APR" means Annual Percentage Rate. "DPR" means Daily Periodic Rate and is calculated by dividing the APR by 365.

From time to time we may offer you different interest rates on certain categories of Purchase or Cash Advance transactions. Categories A and B contain Cash Advance transactions. Category C contains Purchase transactions. Category D contains Other Balances which may include from

time to time Purchase transactions and/or any pre-existing Cash Advance balances (which will be treated as previous Purchase balances) or Purchase balances.

**Periodic Rate Finance Charges:** We calculate Periodic Rate Finance Charges for each category by multiplying its Balance Subject to Finance Charge by the applicable DPR and that result by the number of days in the billing cycle.

The current DPR for Category A Balance Transfers and Check Cash Advances is 0.004657% (corresponding **ANNUAL PERCENTAGE RATE of 1.70%**). The DPR and corresponding APR for Category A Balance Transfers and Check Cash Advances are promotional rates in effect through your statement Closing Date in March 2003. Thereafter, the DPR for all new and outstanding Category A Balance Transfers and Check Cash Advances will be 0.035589% (corresponding **ANNUAL PERCENTAGE RATE of 12.99%**). Through this promotional period, if any minimum payment is not received by its Payment Due Date, then on the first day of the billing cycle in which such payment is missed, the DPR for all new and outstanding Category A Balance Transfers and Check Cash Advances will be 0.035589% (corresponding **ANNUAL PERCENTAGE RATE of 12.99%**).

The current DPR for Category B Bank and ATM Cash Advances and Category C Purchases is 0.035589% (corresponding **ANNUAL PERCENTAGE RATE of 12.99%**. The current DPR for Category D Other Balances is 0.035589% (corresponding **ANNUAL PERCENTAGE RATE of 12.99%**).

**Grace Period/When Finance Charges Begin to Accrue:** Your Payment Due Date will be at least 25 days from your statement's Closing Date. Periodic Rate Finance Charges will accrue on new Purchases only if the prior statement's New Balance Total, if any, is not paid in full by its Payment Due Date. Periodic Rate Finance Charges will accrue on previous Purchases only if either of the two prior statement's New Balance Totals, if any, are not paid in full by their respective Payment Due Dates. When applicable, Periodic Rate Finance Charges on each Purchase accrue daily from the transaction date or the first day of the billing cycle, whichever date is later, until the date each Purchase is completely repaid according to the payment allocation method then in effect.

Periodic Rate Finance Charges on each Cash Advance accrue daily from the transaction date until the date each Cash Advance is completely repaid according to the payment allocation method then in effect.

**Categories A and B - Average Cash Advance Balance Method:** We calculate the Balance Subject to Finance Charge for each Cash Advance category as follows: Each day of the current billing cycle, we take the beginning Cash Advance balance, including accrued but unpaid Finance

Charges, add new Cash Advances, and subtract payments or credits. This gives us the daily Cash Advance balance. If any daily Cash Advance Balance is less than zero we will treat that balance as zero. We add together the current billing cycle's daily Cash Advance balances. We then include, for each day prior to the current billing cycle, balances on Cash Advances that had a transaction date prior to the current billing cycle but which were posted to your account in the current billing cycle. We divide this total by the number of days in the billing cycle. This gives us the Average Cash Advance Balance (a Balance Subject to Finance Charge).

**Categories C and D - Average Daily Balance Method:** We calculate the Balance Subject to Finance Charge for each of these categories as follows: Each day, we take the beginning balance, including accrued but unpaid Finance Charges, add new transactions and new Account Fees, and subtract payments or credits. This gives us the daily balance. We do not include the costs for the MBNA Credit Protection plan or for credit insurance purchased through MBNA America in the beginning balance until the first day of the billing cycle after the billing cycle in which they are billed. We do not add new transactions, new Account Fees, or new Cash Equivalent Transaction Fees when the prior statement's New Balance Total, if any, is paid in full by its Payment Due Date. If any daily balance is less than zero we will treat that balance as zero. We add the daily balances for the billing cycle together and divide the total by the number of days in the billing cycle. This gives us the Average Daily Balance (a Balance Subject to Finance Charge).

**Transaction Fee Finance Charges:** If you use your card to purchase Cash Equivalents, we will assess a transaction fee (**FINANCE CHARGE**) equal to 3.00% of the U.S. Dollar amount of each such Purchase (Fee: Min. $5.00). If you obtain a Bank Cash Advance, we will assess a transaction fee (**FINANCE CHARGE**) equal to 3.00% of the U.S. Dollar amount of each such

Cash Advance (Fee: Min. $5.00). If you obtain an ATM Cash Advance, we will assess a transaction fee (**FINANCE CHARGE**) equal to 3.00% of the U.S. Dollar amount of each such Cash Advance (Fee: Min. $5.00). If you obtain a Check Cash Advance, a Balance Transfer, or an Other Cash Advance, we will assess a transaction fee (**FINANCE CHARGE**) equal to 3.00% of the U.S. Dollar amount of each such Cash Advance (Fee: Min. $5.00; Max. $40.00).

**Account Fees:** (1) A Late Fee of $15.00 each time you fail to make the required Minimum Payment shown on your statement by its Payment Due Date; (2) Overlimit Fee: $15.00; (3) Returned Payment Fee: $29.00; (4) Returned Cash Advance Check Fee: $29.00; (5) a Copy Fee of $2.50 per monthly statement and $2.50 per sales draft; however, the six most recent monthly statements and six sales drafts will be provided free of charge.

**Minimum Payment:** The Total Minimum Payment Due each billing cycle will be the sum of the Current Payment plus all past due amounts. The Current Payment each billing cycle will be the lesser of: 1) the sum of all Periodic Rate Finance Charges, Transaction Fees, and Account Fees (excluding Returned Cash Advance Check Fees, Copy Fees, and Abandoned Property Charges) plus $15.00; or 2) 2.25% of the New Balance Total. The current payment will never be less than $15.00 unless your New Balance Total is less than $15.00 in which case the Total Minimum Payment Due will equal the New Balance Total. If a payment is credited to your account but is returned unpaid in a later billing cycle, we will recalculate the Current Payment for the billing cycle in which the payment was originally credited.

## Your Billing Rights

**Keep this notice for future use.**

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.** If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at MBNA America Bank, N.A., P.O. Box 15026, Wilmington, DE 19850. Write to us as soon as possible. Do not send the notice on or with your payment. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following: 1) your name and account number; 2) the dollar amount of the suspected error; and 3) a description of the error and an explanation, if you can, of why you believe there is an error. If you need more information, describe the item you are not sure about.

PLEASE KEEP THIS CARD CARRIER. IT IS PART OF YOUR AGREEMENT.                    (Continued on reverse side)



**CREDIT PROTECTION SUMMARY.** The Plan is optional and not a condition to granting credit. Complete terms and conditions are sent at enrollment. You have 30 days from enrolling to cancel without cost. In a benefit period, charging privileges are suspended; finance charges accrue. Subject to conditions/ limits, the Plan provides a monthly benefit and a total debt benefit. A monthly benefit cancels the Current Payment for Involuntary Unemployment (IU), Hospitalization, Total Disability (TD), or unpaid, employer-approved Family Leave of Absence (FLA). A total debt benefit cancels the balance owed for Accidental Death (*Covered Occurrences*). Up to 24 (3 for FLA) total payments cancelled per benefit period. The amount cancelled as of a Covered Occurrence is the lesser of $25,000 or the balance owed. Eligibility. A primary/co-applicant can enroll. An account can't enroll/remain enrolled if past due. Enrollment must precede a Covered Occurrence. TD and Hospitalization exclude conditions diagnosed/ treated within 6 months of enrollment. An enrolled person must have worked 30+ hours/week in a permanent job-not self-employed/independent contractor-for 30 consecutive days for IU (90 for FLA). TD/IU/FLA must continue for 30 consecutive days before benefits may begin. On enrollment, a Plan Fee is assessed by multiplying a monthly rate ($0.85 per $100) by the Plan balance each billing cycle. The Plan balance is the greater of the New Balance Total less the Plan Fee billed or the total of the Balances Subject to Finance Charge, with a $25,000 maximum. The Plan Fee bills as a Purchase/Other Charge and is added to the balance monthly. For Gold Option lines of credit, purchase will extend the repayment period. The rate may change. This is debt cancellation, not insurance. Not available in all states. May be taxable.

---

## BUSINESS REPLY MAIL
### FIRST-CLASS MAIL  PERMIT NO. 317  WILMINGTON, DE

POSTAGE WILL BE PAID BY ADDRESSEE

**Credit Protection Plan**
**P.O. BOX 15114**
**WILMINGTON, DE 19885-5114**

---

(Continued from bottom panel on reverse side)

If you have authorized us to pay your credit card bill automatically from your savings or checking account with us, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us at least three business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.** We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question or report you as delinquent. We can continue to bill you for the amount you question including Finance Charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any Finance Charges related to any questioned amount. If we did not make a mistake, you may have to pay Finance Charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within twenty-five (25) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill, and we must tell you the name of anyone we report you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we cannot collect the first $50 of the questioned amount, even if your bill was correct.

**Special Rule for Credit Card Purchases.** If you have a problem with the quality of the property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

1) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and
2) The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

MBNA America®, MBNA and *Platinum Plus* are service marks of MBNA America Bank, N.A.© 2000 MBNA America Bank, N.A. This credit card is issued and administered by MBNA America Bank, N.A.

*F00056292001032550907/2002*

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

## Selected Sections

■ Privacy notice

■ Accuracy of Information and Credit Reporting

■ How to use your account

■ When law applies

■ Arbitration

# Your Contract With Us

Your Credit Card Agreement with us consists of these Additional Terms and Conditions and the document called the Required Federal Disclosures or the Initial Disclosure. You agree to the terms and conditions of this Agreement. For the purpose of the *Privacy Notice*, we will use the definitions contained in the *Privacy Notice*. For the remainder of the Agreement, we will use the definitions described under the section heading *Words Used Often in This Agreement*.

# Important Infomation About Your Financial Privacy

MBNA is the world's largest independent credit card issuer. Our financial products and services are endorsed by thousands of organizations and financial institutions. We back our financial products and services with top quality service. Collecting and sharing information about you helps us do this. This notice explains MBNA's information collection and sharing practices and lets you choose whether MBNA may share certain information about you.

This notice describes the privacy practices of MBNA Corporation and all its affiliates, including:

- MBNA America Bank, N.A.
- MBNA America (Delaware), N.A.
- MBNA Technology, Inc.
- MBNA Marketing Systems, Inc.
- MBNA Insurance Agency, Inc.

(We'll refer to these collectively as "MBNA"), for financial products and services governed by the laws of the United States of America.

**Our Security Procedures Protect Your Information**

We work hard to keep information secure. For example, our information security policies:

- Govern retention of sensitive information;
- Restrict access to information systems; and
- Specify password requirements.

Our practices and procedures meet federal standards. Further, we share only the information we believe is needed to offer a product or service efficiently. Finally, we restrict the use of such information and require that be kept secure.

**Information We Collect to Conduct Our Business**

We collect information about you to conduct our business and deliver the top quality service you expect. Sources include:

- Information we receive from you.
- Information we receive from third parties, such as consumer reporting agencies, to verify statements you've made to us, or regarding your employment, credit, or other relationships.
- Information about your transactions with MBNA and with other companies.

We may share all the information we collect within MBNA. For example, we may share:

- Identification information (such as name and address);
- Transaction and experience information (such as purchases and payments);
- Credit eligibility information (such as credit reports); and
- Other information.

You may tell us not to share credit eligibility information about you within MBNA, as explained below in the section captioned, "Information Sharing: It's Your Choice." Your choice will not affect the sharing of identification and transaction and experience information.

**Information Shared Outside of MBNA**

We may share all the information we collect with the following types of companies outside of MBNA:

- Financial service companies (like banks, insurance companies, securities broker-dealers, and organizations with which we have joint marketing agreements);
- Non-financial companies (like retailers, direct marketers, communications companies, travel companies, and organizations endorsing MBNA);
- Companies performing marketing or other services for us (like data processing or direct mail services); and
- Other companies (like nonprofit organizations).

We may also share all of the information we collect with companies outside of MBNA as permitted by law.

You may tell us not to share information about you with companies outside of MBNA, as explained below in the section captioned, "Information Sharing: It's Your Choice." Your choice will not affect sharing with:

- Companies performing marketing or other services for us;
- Other financial institutions under joint marketing agreements;
- Government entities in response to subpoenas or regulatory requirements;
- Consumer reporting agencies; and
- As otherwise permitted by law.

**Information Sharing: It's Your Choice**

We respect your choices related to privacy. You may tell us not to share credit eligibility information within MBNA and not to share information with companies outside of MBNA as described above. **If you wish to opt out of such information sharing, please call our toll-free automated response line at 1-866-751-1255.**

We will ask you to verify your identity and the specific accounts to which your opt out applies. Please have your account, membership, or reference numbers available when you call. For deposit accounts, please have your Social Security number or Taxpayer Identification number available when you call.

MBNA applies opt outs at the account level, not by individual Customer. When any person listed on an account opts out, we opt out the entire account. This

includes deposit account holders, and authorized users. MBNA follows these privacy practices if an account is closed or becomes inactive.

Your opt out remains effective until revoked in writing. Federal law requires us to provide this notice on an annual basis, whether or not you previously opted out. **Please remember that if you previously opted out an account you do not need to opt out that account again.**

**Important Information for Vermont Customers**

The information sharing practices described above are in accordance with Federal law. Vermont law places additional limits on sharing information about Vermont residents so long as they remain residents of Vermont. In accordance with Vermont law, MBNA will not share information we collect about Vermont residents to companies outside of MBNA except:

- As permitted by law;
- To companies that perform marketing or other services on our behalf;
- Name, contact and transaction and experience information (such as your account balance and payment history) to other financial institutions with which we have joint marketing agreements; or
- With the authorization or consent of the Vermont resident.

MBNA will not share credit eligibility information about Vermont residents within MBNA except with the authorization or consent of the Vermont resident.

**Updates and Additional Information**

This notice replaces any previous notices from MBNA about the privacy, security, and protection of information. For additional information regarding our Internet privacy practices, and to view the current version of this privacy notice, go to http://www.mbna.com/privacy.html. You may have other privacy protections under state laws. We may amend this privacy notice at any time. We will inform you of changes as required by law.

***Tips to Protect Your Information***

*MBNA works hard to keep your information secure. You can help by following these tips to protect your information:*

- *Store personal information in a safe place and tear up or shred old receipts and account statements before throwing them away.*
- *Protect your PINs and other passwords. Do not share them with anyone unless it's for a service or transaction you request and you are confident the other party will protect the information as you would.*
- *Carry only the minimum amount of identifying information you require.*
- *Pay attention to billing cycles and statements. Inquire if you do not receive a bill.*
- *Check account statements carefully to ensure all charges, checks, or withdrawals are authorized.*
- *Guard your mail from theft. Do not leave bill payment envelopes in your mailbox with the flag up. Instead, deposit them in a post office collection box or at the local post office. Promptly remove incoming mail.*

- *Order copies of your credit report from each of the three major credit bureaus once a year to ensure they are accurate. The law permits the credit bureaus to charge up to $8.00 for a copy of the report (unless you live in a state that requires the credit bureaus to provide you with one free copy of your report annually).*
- *If you believe you are a victim of identity theft take immediate action and keep records of your conversations and correspondence. While the steps you must take will vary with your individual circumstances, three basic actions are appropriate in almost every case:*
  - *Contact the creditors for any accounts that have been tampered with or opened fraudulently.*
  - *Contact the fraud departments of each of the three major credit bureaus:*
    - *Equifax: 1-800-525-6285*
      *P.O. Box 740241, Atlanta, GA 30374-0241*
    - *Experian: 1-888-397-3742*
      *P.O. Box 9532, Allen, TX 75013*
    - *Trans Union: 1-800-680-7289*
      *P.O. Box 6790, Fullerton, CA 92834*
  - *File a report with your local police or the police in the community where the identity theft took place and get a copy of the police report.*

*Although many consumers appreciate the convenience and customer service of direct marketing:*

- *If you prefer not to receive pre-approved offers of credit, you can opt out of such offers by calling 1-888-5-OPT OUT.*
- *If you want to remove your name from many national direct mail lists, send your name and address to:*
  *DMA Mail Preference Service*
  *P.O. Box 643*
  *Carmel, NY 10512*
- *If you want to reduce the number of telephone solicitations from many national marketers, send your name, address and telephone number to:*
  *DMA Telephone Preference Service*
  *P.O. Box 1559*
  *Carmel, NY 10512*

*From "ID Theft: When Bad Things Happen to Your Good Name", Federal Trade Commission, February 2002*

## Words Used Often in This Agreement

"Agreement" or "Credit Card Agreement" means these Additional Terms and Conditions and the Required Federal Disclosures (or the Initial Disclosure) and any changes we make to those documents from time to time.

"You" and "your" mean each and all of the persons who are granted, accept, or use an account we hold. "You" and "your" also mean any other person who has guaranteed payment of this account, when used in the sections entitled *We May Monitor and Record Telephone Calls* and *Arbitration and Litigation* and when used in each of the sections relating to payment of this account (*Your Promise to Pay* and *How We Allocate Your Payments*, for example).

"We," "us," "our", and "MBNA America" mean MBNA America Bank, N.A.

"Card" means all the credit cards we issue to you and to any other person with authorization to use this account pursuant

to this Agreement.

"Access check" means an access check we provide to you to make a Check Cash Advance on your account.

If we use a capitalized term in this document but do not define the term in this document, the term has the meaning given in the Required Federal Disclosures or the Initial Disclosure or as used in your monthly statement.

We use section headings (such as *Words Used Often in This Agreement*) to organize this Agreement. The actual terms of this Agreement are in the sentences that follow and not the headings.

## Sign Your Card

You should sign your card before you use it.

## We May Monitor and Record Telephone Calls

You consent to and authorize MBNA America, any of its affiliates, or its marketing associates to monitor and/or record any of your telephone conversations with our representatives or the representatives of any of those companies.

## Credit Reporting Agencies

You authorize MBNA America to collect information about you, including credit reports from consumer reporting agencies.

If you believe we have furnished inaccurate or incomplete information about you or your account to a credit reporting agency, write us at: MBNA, Credit Reporting Agencies, P.O. Box 17054, Wilmington, DE 19884-7054. Please include your name, address, home phone number, and account number, and explain what you believe is inaccurate or incomplete.

## How to Use Your Account

You may obtain credit in the form of Purchases and Cash Advances by using your cards, access checks, account number, or other credit devices. Please refer to your Required Federal Disclosures or Initial Disclosure to determine what transactions constitute Purchases and Cash Advances and how you may obtain them.

## Transaction Date for Certain Cash Advances

The transaction date for Check Cash Advances and Balance Transfers done by check is the date you or the person to whom the check is made payable first deposits or cashes the check. The transaction date for a returned payment (which will then be classified as a Bank Cash Advance) is the date that the corresponding payment posted to your account.

## Purposes for Using Your Account

You may use your account for personal, family, or household purposes. You may not use your account for business or commercial purposes. You may not use a Check Cash Advance, or any other Cash Advance, to make a payment on this or any other credit account with us. You may not use or permit your account to be used to make any illegal transaction.

## Persons Using Your Account

If you permit any person to use your card, access checks, account number, or other credit device with the authorization to obtain credit on your account, you may be liable for all transactions made by that person, including transactions for which you may not have intended to be liable, even if the amount of those transactions causes your credit limit to be exceeded. Authorized users of this account may have the same access to information about the account and its users as the account holders.

## How You May Stop Payment on an Access Check

You may request a stop payment on an access check by providing us with the access check number, dollar amount, and payee exactly as they appear on the access check. Oral and written stop payment requests on an access check are effective for six months from the day that we place the stop payment.

## You May Not Postdate an Access Check

You may not issue a postdated access check on your account. If you do postdate an access check, we may elect to honor it upon presentment or return it unpaid to the person who presented it to us for payment, without, in either case, waiting for the date shown on the access check. We are not liable to you for any loss or expense incurred by you arising out of the action we elect to take.

## Your Promise to Pay

You promise to pay us the amounts of all credit you obtain, which includes all Purchases and Cash Advances. You also promise to pay us all the amounts of finance charges, fees, and any other transactions we charge against your account.

## Payments on Your Account

You must pay each month at least the Total Minimum Payment Due shown on your monthly statement by your Payment Due Date. You may pay the entire amount you owe us at any time. Payments made in any billing cycle that are greater than the Total Minimum Payment Due will not affect your obligation to make the next Total Minimum Payment Due. If you overpay or if there is a credit balance on your account, we will not pay interest on such amounts. We will reject payments that are not drawn in U.S. dollars and those drawn on a financial institution located outside of the United States. Payment of your Total Minimum Payment Due may not avoid the assessment of Overlimit Fees. Generally, credits to your account, such as those generated by merchants or by person-to-person money transfers, are not treated as payments and will not reduce your Total Minimum Payment Due.

## When Your Payment Will Be Credited to Your Account

We credit payments as of the date received, if the payment is (1) received by 2 p.m. (Eastern Time); (2) received at the address shown in the upper left-hand corner of the front of your monthly statement; (3) paid with a check drawn in U.S. dollars on a U.S. financial institution or a U.S. dollar money order; and (4) sent in the return envelope with only the top portion of your statement accompanying it. Payments received after 2 p.m. on any day, including the Payment Due Date, but that otherwise meet the above requirements, will be credited as of the next day. Credit for any other payments may be delayed up to five days.

## How We Allocate Your Payments

We will allocate your payments in the manner we determine. In most instances, we will allocate your payments to balances (including transactions made after your latest statement) with lower APRs before balances with higher APRs. This will result in balances with lower APRs (such as new balances with promotional APR offers) being paid before any other existing balances.

## Promise to Pay Applies to All Persons

All persons who initially or subsequently request, accept, guarantee, or use the account are individually and together responsible for any total outstanding balance. We may refuse to

each such person or persons is responsible to pay any total outstanding balance, until all of the cards, access checks, and other credit devices outstanding under the account have been returned to us and any such person or persons repays us the total outstanding balance owed to us at any time under the terms of this Agreement.

## Default

You will be in default of this Agreement if: (1) you fail to make any required Total Minimum Payment Due by its Payment Due Date; (2) your total outstanding balance exceeds your credit limit; or (3) you fail to abide by any other term of this Agreement. Solely for the purposes of determining eligibility and premium payment obligations for the optional credit insurance purchased through MBNA, you will be deemed in default or delinquent if you fail to make a payment within 90 days of your Payment Due Date. Our failure to exercise any of our rights when you default does not mean that we are unable to exercise those rights upon later default.

## When We May Require Immediate Payment

If you are in default, we can require immediate payment of your total outstanding balance and, unless prohibited by applicable law and except as otherwise provided under the *Arbitration and Litigation* section of this Agreement, we can also require you to pay the costs we incur in any collection proceeding, as well as reasonable attorneys' fees if we refer your account for collection to an attorney who is not our salaried employee.

## Other Payment Terms

We can accept late payments, partial payments, or payments with any restrictive writing without losing any of our rights under this Agreement. This means that no payment, including those marked with "Paid in full" or with any other restrictive words, shall operate as an accord and satisfaction without the prior written approval of one of our senior officers. You may not use a postdated check to make a payment. If you do postdate a payment check, we may elect to honor it upon presentment or return it uncredited to the person who presented it, without, in either case, waiting for the date shown on the check. We are not liable to you for any loss or expense incurred by you arising out of the action we elect to take.

## Payment Holidays

We may allow you, from time to time, to omit a monthly payment. We will notify you when this option is available. If you omit a payment, finance charges and any applicable fees will accrue on your account in accordance with this Agreement. You must resume making your Total Minimum Payment Due each month following a payment holiday.

## Transactions Made in Foreign Currencies

If you make a transaction in a foreign currency, the transaction will be converted by Visa International or MasterCard International, depending on which card you use, into a U.S. dollar amount in accordance with the operating regulations or conversion procedures in effect at the time that the transaction is processed. Currently, those regulations and procedures provide that the currency conversion rate to be used is either (1) a wholesale market rate or (2) a government-mandated rate in effect one day prior to the processing date, increased by one percent in each case. Visa or MasterCard retains this one percent as compensation for performing the currency conversion service. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or the posting date.

7

## Billing Cycle

Your billing cycle ends each month on a Closing Date determined by us. Each billing cycle begins on the day after the Closing Date of the previous billing cycle. Each statement reflects a single billing cycle.

## Account Fees and Charges

**Account Fees:** The following fees, which are set forth in your Required Federal Disclosures or Initial Disclosure, are assessed as Purchases in the billing cycle in which the fees accrue:

1) a Late Fee if the Total Minimum Payment Due shown on your monthly statement is not received by us on or before its Payment Due Date;

2) an Overlimit Fee if your total outstanding balance exceeds your credit limit on the Closing Date of a billing cycle, even if fees or finance charges assessed by us cause your total outstanding balance to exceed your credit limit; an Overlimit Fee is assessed to your account as of the day in the billing cycle that your total outstanding balance exceeds your credit limit;

3) a Returned Payment Fee if a payment on your account is returned for insufficient funds or for any other reason, even if it is paid upon subsequent presentment;

4) a Returned Cash Advance Check Fee if we return an access check unpaid for any reason, even if the access check is paid upon subsequent presentment;

5) a Copy Fee for each copy of a monthly statement or sales draft, except that the six most recent monthly statements and six sales drafts will be provided for free; and

6) an Annual Fee if your account is open or if you maintain an account balance, whether you have active charging privileges or not.

**Abandoned-Property Charges:** Unless prohibited by applicable law, we will charge your account, as a Purchase, for any costs incurred by us associated with complying with state abandoned-property laws.

Please review your Required Federal Disclosures or Initial Disclosure for additional fees and charges that may apply to your account.

## Benefits

We may offer you certain benefits and services with your account. Unless expressly made a part of this Agreement, any such benefits or services are not a part of this Agreement but are subject to the terms and restrictions outlined in the benefits brochure and other official documents provided to you from time to time by or on behalf of MBNA America. We may adjust, add, or delete benefits and services at any time and without notice to you.

## Refusal to Honor Your Account

We are not liable for any refusal to honor your account. This can include a refusal to honor your card or account number or any check written on your account. We are not liable for any retention of your card by us, any other bank, or any provider of goods or services.

## We May Suspend or Close Your Account

We may suspend or close your account or otherwise terminate your right to use your account. We may do this at any time and for any reason. Your obligations under this Agreement continue even after we have done this. You must destroy all cards, access checks, and other credit devices on the account when we request that you do so.

You may close your account by notifying us in writing or by telephone and destroying all cards, access checks, and other credit devices on the account. Your obligations under this Agreement continue even after you have done this.

## Transactions After Your Account Is Closed

When your account is closed, you must contact anyone authorized to charge transactions to your account, such as Internet service providers, health clubs, or insurance companies. These transactions may continue to be charged to your account until you change the billing. Also, if we believe you have authorized a transaction or are attempting to use your account after you have requested to close the account, we may allow the transaction to be charged to your account.

## We May Amend This Agreement

We may amend this Agreement at any time. We may amend it by adding, deleting, or changing provisions of this Agreement. When we amend this Agreement, we will comply with the applicable notice requirements of federal and Delaware law that are in effect at that time. If an amendment gives you the opportunity to reject the change, and if you reject the change in the manner provided in such amendment, we may terminate your right to receive credit and may ask you to return all credit devices as a condition of your rejection. The amended Agreement (including any higher-rate or other higher charges or fees) will apply to the total outstanding balance, including the balance existing before the amendment became effective. We may replace your card with another card at any time.

## We May Sell Your Account

We may at any time, and without notice to you, sell, assign or transfer your account, any sums due on your account, this Agreement, or our rights or obligations under your account or this Agreement to any person or entity. The person or entity to whom we make any such sale, assignment or transfer shall be entitled to all of our rights and/or obligations under this Agreement to the extent sold, assigned or transferred.

## Your Credit Limit

Your credit limit is disclosed to you when you receive your card and, generally, on each monthly statement. We may change your credit limit from time to time.

The amount shown on your monthly statement as Cash or Credit Available does not take into account any Purchases, Cash Advances, finance charges, fees, any other transactions, or credits that post to your account after the Closing Date of that monthly statement. Such transactions could result in your credit limit being exceeded and result in the assessment of Overlimit Fees.

## What We May Do if You Attempt to Exceed Your Credit Limit

The total outstanding balance on your account plus authorization at any time must not be more than your credit limit. If you attempt a transaction that results in your total outstanding balance (plus authorizations) exceeding your credit limit, we may (1) permit the transaction without raising your credit limit; (2) permit the transaction and treat the amount of the transaction that is more than the credit limit as immediately due; or (3) refuse to permit the transaction.

If we refuse to permit the transaction, we may advise the person who attempted the transaction that it has been refused. If we refuse to permit a Check Cash Advance or Balance Transfer, we

9

Advance or Balance Transfer that credit has been refused, that there are insufficient funds to pay the Check Cash Advance or Balance Transfer, or in any other manner.

If we have previously permitted you to exceed your credit limit, it does not mean that we will permit you to exceed your credit limit again. If we decide to permit you to exceed your credit limit, we may charge an Overlimit Fee as provided in this Agreement.

## Unauthorized Use of Your Card

Please notify us immediately of the loss, theft, or possible unauthorized use of your account at 1-800-789-6701.

## You Must Notify Us When You Change Your Address

We strive to keep accurate records for your benefit and ours. The post office and others may notify us of a change to your address. When you change your address, you must notify us promptly of your new address.

## What Law Applies

This Agreement is made in Delaware, and we extend credit to you from Delaware. This Agreement is governed by the laws of the State of Delaware (without regard to its conflict of laws principles) and by any applicable federal laws.

## The Provisions of This Agreement Are Severable

If any provision of this Agreement is found to be invalid, the remaining provisions will continue to be effective.

## Our Rights Continue

Our failure or delay in exercising any of our rights under this Agreement does not mean that we are unable to exercise those rights later.

## Arbitration and Litigation

This *Arbitration and Litigation* provision applies to you unless you were given the opportunity to reject the *Arbitration and Litigation* provisions and you did so reject them in the manner and timeframe required. If you did reject effectively such a provision, you agreed that any litigation brought by you against us regarding this account or this Agreement shall be brought in a court located in the State of Delaware.

Any claim or dispute ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or any prior Agreement or your account (whether under a statute, in contract, tort, or otherwise and whether for money damages, penalties, or declaratory or equitable relief), including Claims regarding the applicability of this *Arbitration and Litigation* section or the validity of the entire Agreement or any prior Agreement, shall be resolved by binding arbitration.

The arbitration shall be conducted by the National Arbitration Forum ("NAF"), under the Code of Procedure in effect at the time the Claim is filed. Rules and forms of the National Arbitration Forum may be obtained and Claims may be filed at any National Arbitration Forum office, www.arb-forum.com, or P.O. Box 50191, Minneapolis, Minnesota 55405, telephone 1-800-474-2371. If the NAF is unable or unwilling to act as arbitrator, we may substitute another nationally recognized, independent arbitration organization that uses a similar code of procedure. At your written request, we will advance any arbitration filing fee, or administrative and hearing fees which you are required to pay to pursue

a Claim in arbitration. The arbitrator will decide who will be ultimately responsible for paying those fees. In no event will you be required to reimburse us for any arbitration filing, administrative or hearing fees in an amount greater than what your court costs would have been if the Claim had been resolved in a state court with jurisdiction. Any arbitration hearing at which you appear will take place within the federal judicial district that includes your billing address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"). Judgment upon any arbitration award may be entered in any court having jurisdiction. The arbitrator shall follow existing substantive law to the extent consistent with the FAA and applicable statutes of limitations and shall honor any claims or privilege recognized by law. If any party requests, the arbitrator shall write an opinion containing the reasons for the award.

No Claim submitted to arbitration is heard by a jury and no Claim may be brought as a class action or as a private attorney general. You do not have the right to act as a class representative or participate as a member of a class of claimants with respect to any Claim. This *Arbitration and Litigation* section applies to all Claims now in existence or that may arise in the future.

This *Arbitration and Litigation* section shall survive the termination of your account with us as well as any voluntary payment of the debt in full by you, any bankruptcy by you or sale of the debt by us.

For the purposes of this *Arbitration and Litigation* section, "we" and "us" means MBNA America Bank, N.A., its parent, subsidiaries, affiliates, licensees, predecessors, successors, assigns, and any purchaser of your account, and all of their officers, directors, employees, agents and assigns or any and all of them. Additionally, "we" or "us" shall mean any third party providing benefits, services, or products in connection with the account (including but not limited to credit bureaus, merchants that accept any credit device issued under the account, rewards or enrollment services, credit insurance companies, debt collectors and all of their officers, directors, employees and agents) if, and only if, such a third party is named by you as a co-defendant in any Claim you assert against us.

If any part of this *Arbitration and Litigation* section is found to be invalid or unenforceable under any law or statute consistent with the FAA, the remainder of this *Arbitration and Litigation* section shall be enforceable without regard to such invalidity or unenforceability.

THE RESULT OF THIS ARBITRATION AGREEMENT IS THAT, EXCEPT AS PROVIDED ABOVE, CLAIMS CANNOT BE LITIGATED IN COURT, INCLUDING SOME CLAIMS THAT COULD HAVE BEEN TRIED BEFORE A JURY, AS CLASS ACTIONS OR AS PRIVATE ATTORNEY GENERAL ACTIONS.

©2002 MBNA America Bank, N.A.

All rights reserved

**NEXT90 (Revised 8/2002)**

# Exhibit B

## Credit Card Agreement

# General

In this Credit Card Agreement, the words "you" and "your" refer to each and all of the persons who accept a credit card issued by us or under an account we hold. This Agreement consists of this document and the terms and conditions set forth in the Required Federal Disclosures that appear on the accompanying card carrier. The words, "we," "us," "our" and "MBNA America" mean MBNA America Bank, N.A.

When you accept or use the account, you agree to the terms in this Agreement. You should sign your card before you use it.

By accepting or using this account, you authorize MBNA America Bank, N.A. to record your calls with the bank and consent to that recording.

# How To Use Your Card

You may use your card to purchase, rent or lease goods or to purchase services ("purchases") from persons who honor the card. You may also obtain loans ("cash advances") from us or from any bank that accepts the card or by using Premium Access Checks® and Preferred Access Checks® we may provide to you for that purpose or by using your card at an Automated Teller Machine ("ATM"). You may use Premium Access Checks® and Preferred Access Checks® for any bona fide purpose except that you may not use them to make a payment on this or any other credit account with us.

Certain establishments may cash your personal checks upon presentment of your card. In the event we are required to pay the amount of a check cashed in this way because the check is not paid for any reason, we will charge your account for a cash advance in the amount of the check and any processing charge we actually incur.

If you permit any person to have access to your card or account number with the authorization to make a charge, you may be liable for all charges made by that person including charges for which you may not have intended to be liable.

1

# Repayment

You promise to pay us the amounts of all credit you obtain, any charges and insurance premiums we charge against your account, and Finance Charges.

You may pay the entire amount outstanding at any time. You must pay each month at least the minimum payment on your monthly statement. If you overpay or if a credit balance is otherwise created in your account, we will not pay interest on such amounts. Your payment will be allocated in a manner we determine. All payments will be credited to your account for the billing cycle in which payment is received. Minimum monthly payments cannot be made in advance and payments made in any billing cycle which are greater than the minimum payment due will not affect your obligation to make subsequent minimum payments each month. We can reject payments not denominated in U.S. dollars or not drawn on a U.S. Bank. No payment shall operate as an accord and satisfaction without the prior written approval of a Senior Officer of MBNA America Bank, N.A.

# Charges Made in Foreign Currencies

If you incur a charge in a foreign currency, the charge will be converted by Visa International or MasterCard International, depending on which card you use, into a U.S. dollar amount in accordance with the operating regulations or conversion procedures in effect at the time that the transaction is processed. Currently, those regulations and procedures provide that the currency conversion rate to be used is either (1) a wholesale market rate or (2) a government-mandated rate in effect one day prior to the processing date, increased by one percent in each case. Visa or MasterCard retains this one percent as compensation for performing the currency conversion service. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or the posting date.

# Payment Holidays

We may allow you, from time to time, to omit a monthly payment. We will notify you when this option is available. If you omit a payment, Finance Charges and insurance premiums, if any, will accrue on your balance in accordance

with this Agreement. Minimum payments will resume following your payment holiday.

# Billing Cycle

A billing cycle ends on the closing date of the current monthly statement and begins on the day after the closing date of the preceding monthly statement.

# Other Charges

**Overlimit Fee:** The overlimit fee shown on your card carrier will be assessed as of the date your account exceeds your credit limit unless you cure the overlimit problem by the end of the billing cycle. If your account is overlimit at the beginning of a billing cycle, the overlimit fee will be assessed on the first day of that billing cycle unless you cure the overlimit problem by the end of the billing cycle.

**Abandoned Property Charges:** Unless prohibited by applicable law, we will charge your account, as a purchase, for any costs associated with complying with state abandoned property laws.

**Additional Charges:** Please review the accompanying card carrier for additional charges that may apply to your account.

# Insurance and Cost Disclosures

**Enrollment:** Only one Customer per account is eligible. When you enroll, you will be mailed your certificates explaining your coverage and indicating your effective date. To enroll, you must be under age 66 (age 70 in AZ, NV, VA; age 71 in FL, GA, MI, MO and OK). Credit life insurance and disability insurance terminate at these ages. In Texas, unemployment insurance terminates at age 66. For unemployment coverage, you must be gainfully employed and working at least 30 hours a week (not self-employed* or an independent contractor) for at least 90 consecutive days before date of loss (in Colorado, before application date; in Texas, before the effective date of coverage).

**Unemployment and Disability Benefits and Terms:** Monthly payments are limited to the minimum amount due (except in MI) on your account, excluding past-due or over-credit-line amounts. In the event you become

3

involuntarily unemployed due to job loss, general strike, unionized labor dispute or lock-out, or totally disabled due to sickness or injury and cannot perform the material and substantial duties of your job, payments will be made for up to 12 months** or until you return to work, whichever comes first. Total benefits will be paid up to the least of your insured outstanding balance at the date of loss, the amount of your credit limit, or $15,000. Benefits begin after the 30th consecutive day of your unemployment or disability. For Michigan residents, the disability benefit is 1/30th of the monthly benefit for each day of disability over 30 days. The monthly benefit equals 5% of the lesser of the balance due under your account on the first day of disability or $15,000. Unemployment insurance does not cover retirement, resignation, voluntary forfeiture of income, job loss because of willful or criminal misconduct or disability otherwise covered or expressly excluded by GoldPlus (Strike coverage is not available in Illinois). Disability insurance does not cover losses caused by normal pregnancy (except in CA, MA and NV) or childbirth (except in CA, MA, NC, NV and VA), intentionally self-inflected injuries (except in MD), or a condition which required medical diagnosis or treatment in the six months before your coverage began if the loss occurs in the first six months of coverage (except in NJ).

**Life and Dismemberment Insurance Benefits & Terms:** Payment will be made in the amount of the insured outstanding balance at the time of death (not to exceed the lesser of your credit limit or $15,000). Life insurance does not cover suicide during the first six months of coverage (except in MD or MO). Dismemberment is not available in CA, DE, ID, KS, RI and WA.

**Costs:** This insurance costs 60¢ per $100 per month (in Iowa 7.2¢ life, 14.4¢ disability, 38.4¢ unemployment, in Idaho 8.6¢ life, 12.6¢ disability, 38.8¢ unemployment, in Virginia 7.5¢ life, 7.5¢ disability, 45¢ unemployment and in Wisconsin 5.0¢ life, 10.0¢ disability, 45.0¢ unemployment); 24.7¢ in Colorado, 42.89¢ in Connecticut, 58.84¢ in Maryland, 40.8¢ in Missouri, 54.3¢ in North Carolina and 33.7¢ in Texas (5.7¢ life, 12¢ disability, 16¢ unemployment) of your insured average daily balance, except in Massachusetts, Minnesota and Vermont, where coverage is limited to life and disability insurance at a cost of 18.4¢ in Massachusetts, 23¢ in Minnesota, and 11.1¢ in Vermont (4.9¢ for life and 6.2¢ for disability). Dismemberment

4

premiums are waived. The average daily outstanding balance used to calculate the GoldPlus

premium is not necessarily the same as the average daily balance used to calculate finance charges, as displayed on your monthly statement.

**Availability:** This coverage is not available in Alabama, Maine, New York and Pennsylvania.

**Underwriters:** GoldPlus insurance coverages are offered through MBNA America, N.A. at 400 Christiana Road, Newark, DE 19713, and are underwritten by the following insurance companies at P.O. Box 50355, Atlanta, GA 30302. Unemployment by American Security under LOI (5/85) and AS-LOI-TX (6/92), by Standard Guaranty under SG-LOI (5/85) (NH only); Life, Dismemberment and Disability by Union Security Life and Standard Guaranty Life (TX only) under L-I-Z and L-I-Z (3.53RA) (TX only). Soliciting agent for MS: Aaron B. Dupuy, III.

* Employees of professional corporations are eligible for enrollment.
** Disability benefits may exceed 12 months in California, Hawaii, Indiana, Michigan, New Jersey, Tennessee, Texas and Wisconsin.

MBNA America® and GoldPlus® are federally registered service marks of MBNA America Bank, N.A.

> **Texas Residents Only.** State law requires that we offer you coverage on a separate basis. If you wish to purchase life and disability or unemployment coverage separately, please call 1-800-462-6230 ext. #500. The appropriate applications will be sent to you.

# Benefits

You will be offered certain Benefits which will be subject to the restrictions outlined in the Benefits Brochure provided to you by MBNA America. MBNA America reserves the right to adjust, add, or delete benefits and services at any time.

# Reasons for Requiring Immediate Payment

You will be in default and we can require immediate payment of all amounts you owe if: (i) you fail to make any required payment by the due date; (ii) your New Balance Total exceeds your credit limit or, if we have established a

separate cash advance credit limit for you, your outstanding cash advance balance exceeds your cash advance credit limit; or (iii) you fail to abide by any other terms of this Agreement.

If you default, unless prohibited by applicable law, we can also require you to pay collection and court costs we incur in a collection proceeding, and a reasonable attorney's fee if we refer your account for collection to an attorney who is not our salaried employee.

Our failure to exercise any of our rights when you default does not mean that we are unable to exercise those rights upon later default.

## Refusal to Honor Your Card

We are not liable for any refusal to honor your card or Premium Access Checks® or Preferred Access Checks® or for any retention of your card by us, any other bank, or any seller or lessor of goods or services.

## Termination

We may suspend or terminate your rights to obtain credit at any time for any reason. Your obligations under this Agreement continue after the Agreement is terminated.

## Amendments

We may amend the Agreement by complying with the applicable notification requirements of federal law and those laws of the State of Delaware. Under current law, if we amend the Agreement to either increase the Finance Charge on any balance or increase any other charge which is considered interest under Delaware law, we may require you to pay the higher Annual Percentage Rate or other higher interest charges unless: 1) you write to us at the address and by the date stated in the notice and reject the amendment, and 2) your account is not used after a date specified in our notice. We may ask you to return all credit devices as a condition of your rejection. The amended Agreement (including the higher rate or other higher charges) will apply to the entire unpaid balance, including the balance existing before the amendment became effective. We may replace your credit card with another card at any time.

# Credit Limit

The total amount of credit (purchases plus cash advances) outstanding at any time, together with all charges added to your account, must not be more than your credit limit. Your credit limit is shown on your card carrier and generally on each monthly statement. We may change your credit limit or limits from time to time, and we will notify you if we do. We may also establish a separate credit limit for cash advances. If we do, your outstanding cash advance balance may not exceed this cash advance limit.

# Request for Credit Over Your Credit Limits

If you request credit in any form which, if granted, would result in either your total outstanding balance, including authorized purchases not yet posted to your account, being more than your credit limit or your cash advance balance being more than your separate cash advance credit limit, if we have established one for you, (whether or not such balances before the request were more than the respective credit limit), we may:

- Honor the request without permanently raising your credit limit;
- Honor the request and treat the amount which is more than your credit limit as immediately due; or
- Refuse to honor the request. We may advise the person who made the request that it has been refused. If we refuse to honor a check, we may do so by advising the person presenting the check that credit has been refused, that there are insufficient funds to pay the check, or in any other manner.

If we have previously honored requests for credit over your credit limit, it does not mean that we will honor further overlimit requests. If we decide to honor such a request, we may assess an overlimit fee as provided in this Agreement.

# Unauthorized Use of Your Card

You may be liable for the unauthorized use of your card. You will not be liable for unauthorized use that occurs after you notify us at MBNA America, P.O. Box 15021, Wilmington, DE 19850, (Telephone 1-800-421-2110), orally or in writing, of the loss, theft, or possible unauthorized use. In any case, your liability will not exceed $50.

# Governing Law

This Agreement is made in Delaware. It is governed by the laws of the State of Delaware and by any applicable federal laws. You agree that any litigation brought by you against us regarding this account or this Agreement shall be brought in a court located in the State of Delaware.

If any part of this Agreement is found to be invalid, the rest remains effective. Our failure or delay in exercising any of our rights under this Agreement does not mean that we are unable to exercise those rights later.

All persons who initially or subsequently request, accept or use the account are individually and together responsible for any outstanding balance. If two or more persons are responsible to pay any outstanding balance, we may refuse to release any of them from liability until all of the unexpired cards outstanding under the account have been returned to us and the balance is paid in full.

From time to time, we may require you to provide us with updated credit information. We may report information relating to the use of this card to credit reporting agencies. You must return all credit cards to us on request.

# Exhibit C

IMPORTANT AMENDMENTS
TO YOUR CREDIT CARD AGREEMENT

These Amendments change the terms of your Credit Card Agreement. Please read this document carefully and keep it with your Credit Card Agreement. Except for these Amendments, the terms of your Credit Card Agreement continue in full force and effect.

• Effective with transactions that post to your account on or after January 15, 2000, if you obtain a Check Cash Advance, a Balance Transfer, or an Other Cash Advance, we will assess a transaction fee (**FINANCE CHARGE**) equal to 3.00% of the U.S. Dollar amount of each such Cash Advance (Minimum Fee: $5.00; Maximum Fee $30.00).

• Effective with transactions that post to your account on or after January 15, 2000, if you obtain a Bank Cash Advance, an ATM Cash Advance, or a Cash Equivalent, we will assess a transaction fee (**FINANCE CHARGE**) equal to 3.00% of the U.S. Dollar amount of each such Cash Advance (Minimum Fee: $5.00).

• Effective April 8, 2000, your Minimum Payment will be calculated as follows: The Total Minimum Payment Due each billing cycle will be the sum of the Current Payment plus all past due amounts. The Current Payment each billing cycle will be the lesser of: 1) the sum of all Periodic Rate Finance Charges, Transaction Fees, and Account Fees (excluding Returned Cash Advance Check Fees, Copy Fees, and Abandoned Property Charges) plus $15; or 2) 2.25% of the New Balance Total. The Current Payment will never be less than $15 unless your New Balance Total is less than $15 in which case the Total Minimum Payment Due will equal the New Balance Total. If a payment is credited to your account but is returned unpaid in a later billing cycle, we will recalculate the Current Payment for the billing cycle in which the payment was originally credited.

• You consent to and authorize MBNA America, any of its affiliates, or its marketing associates to monitor and/or record any of your telephone conversations with our representatives or the representatives of any of those companies.

• As provided in your Credit Card Agreement and under Delaware law, we are amending the Credit Card Agreement to include an Arbitration Section. Please read it carefully because it will affect your right to go to court, including any right you may have to have a jury trial. Instead, you (and we) will have to arbitrate claims. You may choose not to be subject to this Arbitration Section by following the instructions at the end of this notice. This Arbitration Section will become effective on February 1, 2000. The Arbitration Section reads:

**Arbitration**: Any claim or dispute ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or any prior Agreement or your account (whether under a statute, in contract, tort, or otherwise and whether for money damages, penalties or declaratory or equitable relief), including Claims regarding the applicability of this Arbitration Section or the validity of the entire Agreement or any prior Agreement, shall be resolved by binding arbitration. " The arbitration shall be conducted by the National Arbitration Forum ("NAF"), under the Code of Procedure in effect at the time the claim is filed. Rules and forms of the National Arbitration Forum may be obtained and Claims may be filed at any National Arbitration Forum office, www.arb-forum.com, or P.O. Box 50191, Minneapolis, Minnesota 55405, telephone 1-800-474-2371. If the NAF is unable or unwilling to act as arbitrator, we may substitute another nationally recognized, independent arbitration organization that uses a similar code of procedure. At your written request, we will advance any arbitration filing fee, administrative and hearing fees which you are required to pay to pursue a Claim in arbitration. The arbitrator will decide who will be ultimately responsible for paying those fees. In no event will you be required to reimburse us for any arbitration filing, administrative or hearing fees in an amount greater than what your court costs would have been if the claim had been resolved in a state court with jurisdiction. Any arbitration hearing at which you appear will take place within the federal judicial district that includes your billing address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"). Judgment upon any arbitration award may be entered in any court having jurisdiction. The arbitrator shall follow existing substantive law to the extent

consistent with the FAA and applicable statutes of limitations and shall honor any claims or privilege recognized by law. If any party requests, the arbitrator shall write an opinion containing the reasons for the award.

No Claim submitted to arbitration is heard by a jury and no Claim may be brought as a class action or as a private attorney general. You will not have the right to act as a class representative or participate as a member of a class of claimants with respect to any Claim. This Arbitration Section does not apply to Claims between you and us previously asserted in any lawsuits filed before the date this Arbitration Section becomes effective. However, this Arbitration Section applies to all Claims now in existence or that may arise in the future.

This Arbitration Section shall survive the termination of your account with us as well as any voluntary payment of the debt in full by you, any bankruptcy by you or sale of the debt by us.

For the purposes of this Arbitration Section, "we" and "us" means MBNA America Bank, N.A., its parent, subsidiaries, affiliates, licensees, predecessors, successors, assigns, and any purchaser of your account, and all of the officers, directors, employees, agents and assigns or any and all of them. Additionally, "we" or "us" shall mean any third party providing benefits, services, or products in connection with the account (including but not limited to credit bureaus, merchants that accept any credit device issued under the account, rewards or enrollment services, credit insurance companies, debt collectors and all of their officers, directors, employees and agents) if, and only if, such a third party is named by you as a co-defendant in any Claim you assert against us. Also, for the purposes of this Arbitration Section, "you" or "yours" shall mean any person or entity approved by us to use the account, including but not limited to all persons or entities contractually obligated on the Account and all authorized users of the account.

If any part of this Arbitration Section is found to be invalid or unenforceable under any law or statute consistent with the FAA, the remainder of this Arbitration Section shall be enforceable without regard to such invalidity or unenforceability.

THE RESULT OF THIS ARBITRATION SECTION IS THAT, EXCEPT AS PROVIDED ABOVE, CLAIMS CANNOT BE LITIGATED IN COURT, INCLUDING SOME CLAIMS THAT COULD HAVE BEEN TRIED BEFORE A JURY, AS CLASS ACTIONS OR AS PRIVATE ATTORNEY GENERAL ACTIONS.

*If you do not wish your account to be subject to this Arbitration Section, you must write to us at MBNA America, P.O. Box 15565, Wilmington, DE 19850. Clearly print or type your name and credit card account number and state that you reject this Arbitration Section. You must give notice in writing; it is not sufficient to telephone us. Send this notice only to the address in this paragraph; do not send it with a payment.* **We must receive your letter at the above address by January 25, 2000 or your rejection of the Arbitration Section will not be effective.**

© 1999 MBNA America Bank, N.A.

# Exhibit D



**Robert S. Dorfman**
**48 Cherry Tree Road**
**Cotuit, MA 02635**

January 2, 2004

MBNA
Billing Inquires
P.O. Box 15026
Wilmington, DE 19850-5026

**VIA CERTIFIED MAIL # 7003-1010-0004-7567-2696**

RE:    Billing Error on Account # 4264 2951 5107 4332
       Amount in Dispute: $23,772.97
       Date of Last Statement: Dec 10, 2003

Dear MBNA:

I am writing regarding the above referenced account. As a result of my review and investigation into the account, I have found that you may be recording my most recent statement incorrectly, I recently received the last statement and it does not seem to reflect credits due and owing to me from you.

I am concerned because MBNA failed to credit my account for money or credits accepted from me. I believe that MBNA accepted my signed note and other promises to pay into new bank money and credits, but failed to disclose those material facts to me. I believe that I am entitled to receive those new credits or MBNA would be receiving something for nothing, while profiting from the fruit of my labor.

When applying for the credit card, I was led to believe that MBNA would be loaning depositors' money, and that it received from its depositors or investors. However, based on new research, it is my new understanding that MBNA created the money I borrowed, by using my promise to pay it, and then generated computer entries to my account, listing the loan as a credit.

In none of my transactions with MBNA, did any officer or employee notify me that your bank created money by a journal entry (out of thin air). Can you please tell me if this is correct? If it is, then I must conclude that the Bank's transactions relating to me lacked two necessary elements of a valid contract.

I am reserving my right to file a claim against MBNA for violations of the Truth in Lending Act, by failing to disclose that I provided the cash value to fund the alleged loan to myself. MBNA also breached the original credit card agreement through material misrepresentation, lack of full disclosure, and lack of good and fair consideration by failing to perform on the value of the credit card agreement.

I am not an expert in Money, Banking, Economics, or the Laws etc., however I do know the difference between right and wrong. I have spent extensive time, labor, energy, resources, and personal expense in the pursuit of understanding the current United States Monetary System. As a result of my research I believe that good faith and valuable consideration for full disclosure may not have been provided to me in the completion of the purported contractual agreement subsequently subject to dispute.

Please be advised it is not my intention to avoid paying any obligation that I lawfully owe. However, as a result of my research, and careful review of my most recent statement, listed under the section titled Billing Rights Summary, that I have the right to dispute and request that you investigate the concerns listed throughout this correspondence, so that I can make arrangements to pay an obligation which I may owe. This is my request for an investigation of the account and that this account is immediately credited now and in the future. Based on Title 12 Code of Federal Regulations (CFR) section 226.13 (d)(1), pending the outcome of the billing error dispute investigation, I am exercising my right to "withhold disputed amount; collection action prohibited."

The documentary evidence that I am requesting from you is as follows:

**Robert S. Dorfman**
**48 Cherry Tree Road**
**Cotuit, MA 02635**

1. Please have an appropriate corporate officer execute the enclosed Affidavit of Assurance of Due Performance.
2. Please provide the names and addresses of the following persons:
   a. The custodian of records from the credit department that has first hand knowledge of my account.
   b. The custodian of records from the accounting department that has first hand knowledge of accounts within MBNA's general ledger that are interrelated to my account by payment or transfer.
   c. The name of the last CPA that did an internal audit of my account and also for the accounts related to my account.
   d. The name of the representative from Thrift Supervision that oversees MBNA's operations.
3. Please provide the following documents:
   a. The charter for MBNA that is filed in the state where MBNA is domiciled and/or with the office of the Comptroller of the Currency.
   b. The registration filed with the Secretary of State for Massachusetts, showing that MBNA is duly registered to do business in this state.
   c. The front and back side of the original agreement, including any signature of mine that you have on file with respect to this agreement.
   d. The front and back side of the documents that evidence the charges that have been incurred on the account since September 10, 2003.
   e. The accounting ledgers maintained in accordance with Generally Accepted Accounting Principles (GAAP) that contains the bookkeeping entries associated with my account.
   f. The accounting ledgers maintained in accordance with GAAP that contain the bookkeeping entries associated with payments to the vendors due to charges made to my account.
   g. The accounting ledgers maintained in accordance with GAAP that show that MBNA paid the vendors for the charges from its own assets.

Thank you for your time and consideration in this matter, as I am confident that MBNA will comply with the rules under the Fair Credit Billing Act. Furthermore, this constitutes my request for you to cease all telephone communication (including solicitations), as I do not wish to be harassed. I would appreciate if, from this point forward, all correspondence were in writing only.

Sincerely,

*Robert S. Dorfman*

**Robert S. Dorfman**
**48 Cherry Tree Road**
**Cotuit, MA 02635**

# AFFIDAVIT
## of Assurance of Due Performance

Credit Card Company: MBNA                    hereinafter "Credit Provider"
Account number: 4264 2951 5107 4332         hereinafter "Account"
Borrower: Robert S. Dorfman                  hereinafter "Account Holder"

The undersigned affiant, being duly sworn on oath or asseveration, by personal knowledge, deposes and says:

1. That I am an officer of the above named Credit Provider and financial institution, and have full authority and personal knowledge to execute this affidavit on behalf of the Credit Provider, and that I am giving Adequate Assurance of Good Faith and Full Disclosure on behalf of the Credit Provider concerning the terms and execution of the Agreement by the statements in this affidavit, as requested by the Account Holder;

2. That the Credit Provider complied with all applicable Federal Reserve Policies and Procedures, Federal laws, and State laws requiring the use of Generally Accepted Accounting Principles (GAAP) and Generally Accepted Auditing Standards (GAAS) for all bookkeeping entries associated with performing the Account agreement, especially in processing the credit card slips executed by the Account Holder;

3. That it is the policy of the Credit Provider to repay the customers whose deposits are used to fund the charges incurred from the execution of the credit cards slips by the Account Holder according to Account agreement with the Credit Provider;

4. That all material facts pertinent to the Account agreement terms and execution are fully disclosed and contained in the written Account agreement;

5. That all of the Credit Provider's bookkeeping entries associated with the execution of the Account agreement, to wit, the processing of the credit card slips, which are the substance of the Agreement, materially match the terms and form of the Account agreement;

6. That the value given from the Credit Provider's own Net Worth to purchase the Account Holder's credit card slips is NOT substantially less than the face value of the Account Holder's credit card slips;

7. That the Credit Provider did not accept money, money-equivalent, capital, funds or anything of value from the Account Holder in the approximate amounts of the Agreement's credit card slips that were used to fund checks or similar instruments in the approximate amounts of the Agreement's credit card slips that were given or extended to the Account Holder as the Account agreement's loan or credit, causing the Account Holder to be damaged.

8. That the Account Holder's original Account agreement and original credit card slips have not been destroyed, altered or forged, and will be returned to the Account Holder, or, if lost or archived, Credit Provider will provide security indemnifying Account Holder against loss or archival, upon discharge and termination of the Agreement;

9. That there was no "wrongful transfer" of the Account agreement or associated credit card slips that would cause damages to the Account Holder;

10. That the Account Holder may demand full and immediate payment of any and all deposits of funds by Account Holder in connection with the Credit Provider's extending credit or loaning money or money-equivalent pursuant to the Account agreement with the Account Holder, in conformity with Federal Reserve Policies and Procedures concerning the granting of Federally insured loans, to wit, "A deposit created through lending is a debt that has to be paid on demand of the depositor, just the same as a debt

**Robert S. Dorfman**
**48 Cherry Tree Road**
**Cotuit, MA 02635**

arising from a deposit of checks or currency in the bank." (Federal Reserve publication "*Two Faces of Debt*", p. 19);

I, an authorized agent of the Credit Provider, being of clear, conscious and competent mind, understand and agree that I am signing my name under the penalty of perjury and under oath or asseveration administered by the Notary Public named below, and I am accepting full liability, both personal and for the Credit Provider, both civil and criminal, and that I accept all penalties of perjury if and when it is found that my responses in this two-page **Affidavit of Assurance of Due Performance** is false in any way.

_____    _____
Signature of Authorized Lender Agent         Date

_____
Printed Full Name of above signature and title

STATE OF _____ )
                                    ) ss.
COUNTY OF _____ )

On the _____ day of _____, 2003 A.D., before me, _____
(personally known to me, or) proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he or she executed the same in his or her authorized capacity and that by his or her signature on the instrument, the person or the entity upon behalf of which the person acted, signed under oath or asseveration, and accepts the truth thereof.

_____ My commission expires _____
Notary Public Signature

Seal:

# Exhibit E

**IN THE NATIONAL ARBITRATION FORUM**



Robert S. Dorfman
48 Cherry Tree Road
Cotuit, MA 02635
508-428-1791

**RESPONDENT,**

MBNA America Bank, N/A.
c/o Wolpoff & Abramson
Two Irvington Centre
702 King Farm Blvd.
Rockville, MD 20850
800-830-2793

**CLAIMANT.**

**MOTION TO DISMISS FOR LACK OF
JURISDICTION; OBJECTION TO
ARBITRATION**

Forum File Number: FA0407000292457
Account Number: 4264 2951 5107 4332
Cert. Mail: 7002-0860-0003-9122-5229

---

I, Robert S. Dorfman, Respondent, hereby declare and state:

1.    That there is no agreement between the parties to resolve a dispute using arbitration or the National Arbitration forum (Hereinafter "Forum"), or any other Arbitration forum, or at all;

2.    I have never been notified of any change of terms that would require an opportunity for me to opt out of any such change of terms;

3.    That the existence of an agreement to arbitrate must be decided by the courts, and is not to be decided by the Forum;

4.    That this Motion to Dismiss should not be construed as a submittal to Arbitration in any way whatsoever, and that I object to any such arbitration proceeding;

5.    That the National Arbitration Forum would be acting illegally and without jurisdiction by proceeding on the claim;

6.    That I discharge and prohibit the Forum from making any award or taking any other action whatsoever, except to dismiss the case for lack of jurisdiction.

7.    That the generic agreement Plaintiff submitted is not the agreement I received or entered into;

8.    I, Robert S. Dorfman declare that the statements herein and above are true and correct under penalty of perjury.

Signed by Robert S. Dorfman

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Motion was caused to be deposited and mailed on the ___26ᵗʰ___ day of _____August_____, 2004, via Certified Mail Number 7002-0860-0003-9122-5229 to the following party:

Wolpoff & Abramson
Two Irvington Centre
702 King Farm Road
Rockville, Maryland 20850-5775

Dated this ___26ᵗʰ___ day of _____August_____ 2004.

Respectfully submitted and signed b
Robert S. Dorfman,

# Exhibit F

1                UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
2                     WESTERN SECTION

3

4

5   ROBERT DIAMOND        .    Docket No. CA 03-30185-MAP
                          .
6           v.            .    Springfield, MA
                          .
7   MBNA                  .    October 17, 2003
    . . . . . . . . . . . . . . . . . . . . . .    3:01 p.m.
8

9

10

11              TRANSCRIPT OF HEARING HELD

12      BEFORE THE HONORABLE MICHAEL A. PONSOR,

13      UNITED STATES DISTRICT COURT JUDGE.

14

15

16  APPEARANCES:

17

    For the plaintiff:  Mark Bluver and Taruna Garg, 1441
18                      Main Street, Suite 1100, Springfield,
                        MA 01075.
19

20

21  For the defendant:  Beth Bookwalter, 60 State Street,
                        Boston, MA 02109.
22

23              Alice Moran, CSR, RPR, RMR
                 Official Federal Court Reporter
24                1550 Main Street, Room 536
                    Springfield, MA 01103
25          Tel: 413-731-0086  Fax: 413-737-7333

1             (Hearing commenced at 3:01.)

2

3          THE CLERK:  This is the case of Robert Diamond

4    versus MBNA, Civil Action, 03-30185.

5          THE COURT:  We are here this afternoon for

6    argument on the defendant's motion to dismiss and compel

7    arbitration, or in the alternative to stay these court

8    proceedings pending completion of arbitration.

9       What I'd like to do is in a brief and crude way

10   summarize what I understand to be the background facts

11   and also the little flashpoints of disagreement between

12   the parties and then hear your argument.

13      Before I get started, I think I'd like to have

14   counsel introduce themselves so I know who I've got here.

15   I will start here on my left.

16          MS. GARG:  Good afternoon, Judge.  Taruna Garg

17   of Shatz, Schwartz & Fentin.

18          THE COURT:  Very good.  Mr. Bluver.

19          MR. BLUVER:  Good afternoon, Your Honor.  Mark

20   Bluver.

21          THE COURT:  Very Good.

22          MS. BOOKWALTER:  Good afternoon, Your Honor.

23   Beth Bookwalter from Hale & Dorr representing MBNA.

24          THE COURT:  Okay.  One thing I should put on

25   the record is that Mr. Bluver and I know each other in a

1   non-judicial capacity.  We both enjoy bike riding and

2   several times we have been in the same group of riders

3   taking weekend rides.  It's been a while since we've done

4   that, but we do have occasional contacts doing that and

5   also occasionally meeting over at the gym.

6       We don't have an association that's close enough

7   that I feel my objectivity is in any way compromised or

8   even touched, but that is a fact and I just want to make

9   sure defense knew about it.  If you begin to sense

10  there's a problem, bring it to my attention.  You can

11  file an appropriate motion but I wanted to let you know

12  that.

13          MS. BOOKWALTER:  Thank you, Your Honor.

14          THE COURT:  This is in some ways a simple case.

15  It involves the plaintiff who has had a series of

16  problems with charges on his MBNA credit card arising

17  from, as I understand it, online gambling.

18      He has been a credit card holder since 1987 I

19  believe, and -- yes, a credit card holder since November

20  of 1987 with MBNA.

21      In 1999, after Mr. Diamond had been holding the

22  credit card for more than ten years, MBNA amended its

23  agreement with its card holders to include a mandatory

24  arbitration clause which I'll refer to as the amendment.

25      One point of disagreement which I'll look forward to

1   hearing from you about during oral argument is the

2   question of how relevant it is that the plaintiff denies

3   receiving a copy of that amendment, being put on notice

4   of that amendment.

5       The defendant takes the position that there is a

6   presumption when notification occurs in the ordinary

7   course of business that the notification was received.

8       The defendant points out that the plaintiff indeed

9   received his bills on a regular basis at his ordinary

10  place of residence and paid those bills, and that there

11  is a presumption that the amendment was sent out to the

12  same location and that he received it.

13      Mr. Diamond has submitted an affidavit saying that

14  he did not to the best of his knowledge receive the

15  amendment.  And so I'm in somewhat of a quandary, a mild

16  quandary, about that issue.  Because on the one hand it

17  is conceivable that an entity like MBNA, which I assume

18  has tens of thousands, if not hundreds of thousands of

19  card holders, conceivably could forget to send or for

20  some reason omit to send a copy of the agreement to the

21  card holder.

22      It would be hard for them to say absolutely when a

23  card holder says he doesn't think that they ever got a

24  copy of the amendment to point to a registered letter or

25  anything of that sort which would positively confirm that

1    the copy of the amendment was sent.

2        On the other hand, I'm also aware of the fact that

3    most of us when we get this junk from our credit card

4    companies look at it.  We're mystified.  We confirm that

5    it's not a bill and we chuck it in the garbage and forget

6    about whether we ever got it or not.  So I don't know

7    really what that situation is or how relevant that is to

8    the issues in this case.

9        But in any event the defendant says we did it.  It

10   was part of our ordinary practice.  We never had any

11   problem staying in touch with Mr. Diamond.  He must have

12   gotten it.  Mr. Diamond says as far as I know, I never

13   did get it and I don't know the significance of that or

14   how that point should be handled.

15       But, in any event, I think it is undisputed that at

16   least from MBNA's point of view that they did amend their

17   agreement with the card holders and include a mandatory

18   arbitration clause.

19       Two years later, or a year plus later, Mr. Diamond

20   got into some problems with his credit card related to

21   gambling online.

22       Now why anybody would ever do that, heaven only

23   knows.  But, in any event, he did it and he got into

24   problems where he owed over $30,000 on his credit card as

25   a result of online gambling.

1    Now, Mr. Diamond took the position that at least

2    some of that $30,000 plus debt was not legitimate.  That

3    he had winnings which weren't credited.  That there were

4    charges that shouldn't have been on there.  It seems

5    undisputed that at least a significant portion however of

6    that $30,000 plus was -- he took his chance and he lost.

7    Okay.  He contacted MBNA and there was some

8    negotiations which went on and at the conclusion of which

9    it emerged that the credit card company was willing to

10   take $2,500 in complete satisfaction of the $30,000 plus

11   debt that Mr. Diamond was looking at.

12   Around this time, or during the course of these

13   discussions as I understand it, Mr. Diamond was told by

14   somebody at MBNA that we don't enforce gambling debts.

15   Why they wouldn't, I don't know.  But, in any event,

16   somebody said something about we don't enforce gambling

17   charges on our credit cards.

18   I guess what happened at that point was that Mr.

19   Diamond then decided that he probably was being wreckless

20   in suggesting that he even paid $2500 when he really

21   could perhaps not pay anything so he wrote a letter

22   purporting to withdraw his offer apparently to pay the

23   $2500.

24   Then things get a little bit more mystifying because

25   only about three months later Mr. Diamond racks up

1  another $30,000, or at least his credit card reflects a

2  claim of $30,000, an additional $30,000 plus charges

3  related to online gambling and he again disputed the

4  charge.

5      Again, there seems to be -- again, I'm kind of

6  drawing inferences here, but there seems to be a claim on

7  the one hand that the charges were inflated unfairly.

8  That it contains at least some charges that he shouldn't

9  have to pay, and also that maybe he did lose some portion

10  of this $30,000.

11      So there's two defenses to the $30,000 as I

12  understand it.  One is I shouldn't have to pay any of it

13  because I shouldn't have to pay gambling losses that I

14  incurred online.

15      That strikes me as kind of strange because it gives

16  somebody, I suppose -- I don't think he'd give the money

17  back if he won.  So you go online and you use your credit

18  card and bet and then if you lose, you don't have to pay

19  it.  So there's an aspect of this whole gambling online

20  thing that kind of goes over my head.

21      But he makes a claim that he doesn't have to pay any

22  of that because it's a gambling debt I think, but he

23  makes a claim that even if I have to pay what we might

24  call legitimate gambling debts -- that is money that I

25  actually bet and lost -- there's some portion of this

1  $30,000 which is over and above that and which is not

2  legitimate even if you assume that some of the gambling

3  charges are partly his responsibility. So he has, for

4  lack of a better word, a beef about this second $30,000

5  debt that he racked up online.

6  At this point, apparently if I understand it

7  correctly, MBNA is saying, well, no. You owe the $30,000

8  and you also owe the $2500 that we agreed you would pay

9  the first time you got into this problem, and I think

10  that in crude terms is what their position is right now.

11  You owe us $30,000 plus and the plaintiff's position is

12  no, I don't. It's disputed.

13  When the dispute occurred, MBNA invoked its

14  arbitration clause in its current agreement with its card

15  holders, and apparently the claim by MBNA now is for a

16  little over $30,000, $30,300 and change.

17  MBNA invoked the arbitration clause before the

18  National Arbitration Forum. The plaintiff filed a

19  response to the arbitration claim. There was a so-called

20  document hearing which was scheduled in June. Plaintiff

21  filed an objection to that, and then in June of this year

22  filed this lawsuit in superior court several counts

23  including some federal statutes. It was removed here by

24  MBNA and here we are.

25  MBNA's argument is pretty simple. The agreement

1    calls for arbitration; you're not supposed to be here.

2    You're supposed to be in arbitration.

3         Everybody concedes that federal courts love

4    arbitration.  Supreme Courts love arbitration.  Federal

5    courts love arbitration.  That's one headache we don't

6    have to deal with.   It goes into arbitration and there

7    it is.  So there is quite a strong presumption in favor

8    of arbitration which is a boulder that the plaintiff is

9    going to have to deal with here that is not an easy

10   boulder to overcome.

11        The plaintiff takes the position that the

12   arbitration agreement is not enforceable.  First of all,

13   it was a contract of adhesion.  The defendant says that

14   doesn't matter.  It was a take-it-or-leave-it kind of

15   contract.

16        The defendant's position is he was given an

17   opportunity to opt out.  He could have decided that he

18   was going to get his credit card from some other company

19   if he wanted to, and there is nothing that in any way

20   undermines an arbitration agreement simply because it's a

21   one-way contract.

22        The defendant also takes the position that

23   consideration for that agreement was the defendant's

24   continued supplying of credit.

25        The plaintiff takes the position that the

1    arbitration agreement was never properly disclosed to the

2    plaintiff and there was never any meeting of the minds

3    about it.  And, again, I'll be interested in hearing the

4    defendant's position on that.

5         The plaintiff also takes the position that there was

6    a unilateral amendment to the terms of the contract.  And

7    it's certainly true that in some cases the court will not

8    recognize unilateral amendments of the terms of a

9    contract but the defendant responds that in the credit

10   card context, this kind of unilateral amendment is

11   recognized and permitted.

12        I myself have written on a couple of occasions in

13   other context that a unilateral agreement or unilateral

14   amendments to an agreement would not be enforceable.  The

15   question is does that case law really apply to this type

16   of a situation?

17        I guess one of the things that I'm concerned about,

18   and this is a question for the plaintiff, is the kind of

19   slippery slope argument.

20        If there's an arbitration agreement in a contract, a

21   credit card contract, does the plaintiff just have to

22   come in and say I never got it?  It's unilateral.  It's a

23   contract of adhesion and I don't have to go to

24   arbitration.  Because if that's the case, you might as

25   well chuck all the arbitration agreements out.  Everybody

1   is going to be able to say with credibility I don't

2   remember ever getting this agreement and in that case

3   there won't be any arbitrations.

4       People will always be able to come in here and get

5   before a jury.  Although, well, in this case I'm not sure

6   how sympathetic a jury would be to an individual who got

7   himself in over his head in this particular way, but that

8   would be a question for later on.

9       So we're arguing really about the nature of the

10  contract and whether the arbitration agreement applies.

11  The defendant's responses to the plaintiffs are pretty

12  simple.  That this is an enforceable arbitration

13  agreement.  It's governed by Delaware law, not

14  Massachusetts law, and the plaintiff should go ahead and

15  get whatever remedies he's going to get in the

16  arbitration proceeding which is already started.

17      That's a very clumsy summary of some fairly nuanced

18  issues but at least it will put the thing in context, and

19  what I think I'd like to hear now is from you, Ms.

20  Bookwalter.  Correct anything that I've misstated; fill

21  in anything significant that I've left out, and we will

22  just get right to the crux of it.

23          MS. BOOKWALTER:  Thank you, Your Honor.  I

24  think your summary of the allegations in the complaint is

25  fair.  Obviously many of them are contested by MBNA, and

1    cases, just rather than go through it case by case, we

2    have tried to at least address some of the issues that

3    were specifically raised by MBNA in its reply brief.

4           THE COURT:  Okay.  Well, thank you.  I have

5    such a strong feeling about the defendant's motion to

6    dismiss that I know that my decision is going to be a

7    painful one for the plaintiff but I might as well just

8    tear the bandage off here and get the pain over with in

9    one swoop because I do feel quite convinced that the

10   defendant's position is the correct one with regard to

11   the arbitration, and I'm going to rule orally on the

12   motion to dismiss and let you see whether my brothers and

13   sisters upstairs in the First Circuit east of here in the

14   First Circuit agree with me.

15        This was a noble effort on behalf of the plaintiff.

16   He's got himself into a bit of a mess here and

17   plaintiff's counsel are doing absolutely the best they

18   can to extricate him from the problem that he's in.  But

19   my very strong feeling, I'm sorry to say from the

20   plaintiff's point of view, is that to the extent that

21   he's going to be extricated from the problem, it's going

22   to have to take place in the context of arbitration.

23        I want to just lay out very briefly what my reasons

24   are for concluding that.  First of all, I am convinced

25   that Delaware law applies here.  I understand that there

1   is a difference in the bargaining power of the two

2   entities, but if I was to accept that as the main

3   argument, it would simply give anyone who was an

4   individual the right to opt out of any contractual choice

5   of law provision on the ground that that person was in a

6   weaker position at the time that the contract was entered

7   into.  I don't believe that's the law.  I don't believe

8   it's fair.

9        The defendant made it very clear if you want to use

10  our credit services, you're going to have to recognize

11  that Delaware law applies.  If you don't like it, you can

12  go down the street and get a card from someone else that

13  may use a different law.

14       Even if I was to step back and use the choice of law

15  provisions, this is a particularly tough situation for

16  the plaintiff to argue that some law other than Delaware

17  applies.  MBNA is a Delaware corporation.  It informed

18  the plaintiff that they were going to be using Delaware

19  law at the time the contract was entered into.

20       Mr. Diamond lives in Massachusetts.  He has that in

21  his favor, like probably tens of thousands of other

22  people, hundreds of thousands of MBNA's customers.

23       He's not a citizen of Delaware.  Massachusetts' law

24  is more perhaps, although the defendant disagrees, but

25  perhaps for purposes of argument we can say it's somewhat

1    more favorable to the plaintiff.  But again that sort of

2    begs the question, the whole idea -- the whole problem is

3    what law applies, and any time a plaintiff has a better

4    law in his hometown, he's going to be asserting that law.

5        The actual credit was extended somewhere out there

6    in god knows where in cyber space.  The gentleman is

7    sitting on his computer participating in the gambling.

8    It's not like he bought a car down the street here in

9    Massachusetts and that the transaction might be governed

10   by the law of Massachusetts.

11       So wherever this transaction occurred where he found

12   himself the target of these credit charges, it was

13   perhaps defined as just about anywhere out in cyber

14   space.

15       So I think even applying the traditional rules that

16   are used to determine the choice of law, the best

17   argument is that Delaware law really applies.  If

18   Delaware law applies, the plaintiff is clearly out here.

19       In addition, I believe that the original agreement

20   was valid.  All of its terms were valid.  They were

21   without any dispute disclosed to the plaintiff.  The

22   agreement in its original form gave the defendant the

23   right to unilaterally modify the agreement.  The

24   defendant took advantage of that right that it had in

25   1999.

1    I was concerned about this issue of notice.

2    However, I am persuaded that regular procedures were

3    followed, contact with Mr. Diamond was maintained

4    continuously.  There isn't any argument that he changed

5    his address or changed his residence or ever had any

6    problem staying in touch with MBNA, and I think under the

7    circumstances the presumption of proper notice is

8    sufficient to create a record justifying summary

9    judgment.

10    The consideration was the continuation of the

11    extension of credit, and I believe that a unilateral

12    amendment to an at-will contract in these circumstances

13    is valid.

14    Mr. Diamond, assuming that he received notice and I

15    am presuming that for purposes of summary judgment, had

16    the opportunity to opt out and obtain his credit services

17    from some other entity if he wanted to.

18    Under these circumstances my conclusion is that the

19    arbitration agreement contained in the 1999 amendment is

20    valid, does cover this situation, and I'm not going to be

21    doing anybody any favors by pretending that I'm going to

22    go back here and change my mind by thinking about it for

23    another three or four months and give you something in

24    writing and leaving this case in limbo.

25    I'm not going to change my mind for better or worse.

1    I'm quite convinced that that is the proper way to

2    approach this case.  I'm not particularly happy to do

3    that.

4        Mr. Diamond is in a somewhat sympathetic position as

5    kind of a David in conflict with a Goliath.  One's heart

6    is always with the Davids of this world rather than the

7    Goliaths.  But the fact of the matter is I think he's out

8    of luck here and it's not going to help anybody for me to

9    pretend otherwise.

10       So for the reasons that I've just summarized, I'm

11   going to allow the defendant's motion to dismiss and I'm

12   going to order that the parties proceed to arbitration.

13   I will put this order in writing within the next -- well,

14   actually I'll put this in writing.  I'm going to be away

15   next week so the actual written memoraliziation of my

16   ruling will not come out probably for another ten days or

17   two weeks.  It will only be a page or two and at that

18   point judgment will enter for the defendant and the clock

19   will begin to run on the appeal.

20       It won't begin to run as the words are coming out of

21   my mouth at this moment here at four p.m. on October

22   17th.  It will be in the form of a written ruling with

23   formal judgment which you will probably be receiving

24   sometime towards the end of this month.

25       I'm just sorry to say that if somebody is going to

1    find that this arbitration agreement isn't enforceable,

2    it's going to have to be the Court of Appeals, not Judge

3    Ponsor.  I just feel that it is enforceable under these

4    circumstances.  I do thank both of you very much for your

5    very thorough briefing and your very helpful arguments

6    but I'm afraid that's where I come out.  All right.

7    Thank you very much.  The court is in recess.

8

9                     (Court recessed at 4:00.)

10

11

12    UNITED STATES OF AMERICA
      DISTRICT OF MASSACHUSETTS
13    CITY OF SPRINGFIELD

14

15         I, Alice Moran, do hereby certify that the

16    foregoing is a true and accurate transcription of my

17    stenographic notes to the best of my knowledge and

18    ability.

19         Certified on December 1, 2003.  My commission

20    expires on April 8, 2005.

21

22

23    _____
      Alice Moran, CSR, RPR, RMR
24    Official Federal Court Reporter

25